## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **JB BOOKSELLERS, INC., a Kentucky corporation,** | Case No. 10-_____ (    ) |
| **Debtor**[1] | |
| Employer Tax I.D. No. 61-1105130 | |
| In re: | Chapter 11 |
| **JOSEPH-BETH BOOKSELLERS, LLC, a Tennessee limited liability company,** | Case No. 10-_____ (    ) |
| **Debtor** | |
| Employer Tax I.D. No.  31-1566343 | |
| In re: | Chapter 11 |
| **JOSEPH-BETH CAFÉ, LLC, a Tennessee limited liability company,** | Case No. 10-_____ (    ) |
| **Debtor** | |
| Employer Tax I.D. No.  61-1315705 | |

**EMERGENCY MOTION PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363 AND 364, RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND LOCAL BANKRUPTCY RULES 2002-1 AND 4001-1 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING INCURRENCE BY THE DEBTORS OF POST-PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL OTHER SECURED INDEBTEDNESS AND WITH SUPERPRIORITY, (II) GRANTING LIENS, (III) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTORS AND PROVIDING FOR ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors-in-possession (collectively the "Debtors") in the above-captioned cases, by and through their proposed undersigned counsel, hereby move this Court for entry of an interim and, subject to final approval, a final order in substantially the form attached hereto as Exhibit A (the "Interim Order" and, subject to final approval, the "Final Order"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"),

---

[1] The address of the above-captioned Debtors is 1727 Riverside Drive, Cincinnati, OH 45202.

1846653_2

Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and the Local Rules of this Court: authorizing the Debtors to (i) obtain cash advances and other

extensions of credit on a senior secured, revolving basis, in an aggregate principal amount not to

exceed $8,000,000 (the "DIP Credit Facility") pursuant to the DIP Loan Agreement between

Joseph-Beth Booksellers, LLC ("Joseph-Beth" or the "Borrower") and Webster Business Credit

Corporation, (the "DIP Lender"), (the "DIP Loan Agreement," and together with any and all

documents, agreements and instruments delivered pursuant thereto, or as may be amended form

time to time, the "DIP Financing Agreements"),[2] (ii) prepay all amounts owing under the

Prepetition Credit Agreement[3], (iii) granting security interests and superpriority claims, and (iv)

granting adequate protection, pursuant to sections 105, 361, 362, 363, 364(c), (d) and (e) of the

Bankruptcy Code, and Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Local Rules

2001-2 and 4001-2 pursuant to the terms and conditions set forth in the attached proposed

Interim Order.

**CONCISE STATEMENT OF RELIEF REQUESTED
AND SUMMARY OF TERMS OF PROPOSED CREDIT AGREEMENT
AS REQUIRED PURSUANT TO BANKRUPTCY RULE 4001(C)(1)(B)**

The Debtors seek entry of an Interim Order substantially in the form attached hereto as

Exhibit A, authorizing the Debtors, pursuant to Bankruptcy Code sections 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), to: (i) obtain cash advances and other

extensions of credit on a senior secured, revolving basis, in an aggregate principal amount not to

exceed $8,000,000 from the Lender pursuant to the terms and conditions of the DIP Loan

Agreement; (ii) prepay amounts owing under the Prepetition Credit Agreement (other than the

---

[2] A copy of the DIP Loan Agreement is attached hereto as Exhibit B.

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Loan Agreement.

Excluded Portion), (iii) grant security interests and superpriority claims to the DIP Lender, and (iv) grant adequate protection to the Pre-Petition Lender, (iv) schedule a final hearing; and (v) grant such further and related relief as the Court deems just and equitable.

Pursuant to recently enacted Bankruptcy Rule 4001(c)(1)(B), the Debtors set forth herein a concise statement of the requested relief and a summary of the key terms of the proposed DIP Loan Agreement and the locations within the relevant documents of all material provisions of same.[4]

| Reportable Item | Summary |
|---|---|
| The Borrower<br>*Location in DIP Loan Agreement:  Pg. 1*<br>*Location in Order:          Pg. 1* | Joseph-Beth Booksellers, LLC ("Borrower") |
| The Guarantors<br>*Location in DIP Loan Agreement:  Pg. 13*<br>*Location in Order:          Pg. N/A* | JB Booksellers, Inc., Joseph-Beth Café, LLC, and Neil Van Uum. (collectively, the "Guarantors") |
| The Lenders<br>*Location in DIP Loan Agreement:*<br>*  Pgs. 1, 2*<br>*Location in Order: Pg. 2* | Webster Business Credit Corporation |
| Borrowing Limit and Availability<br>*Location in DIP Loan Agreement:*<br>*  Pgs. 21, 23 (Sec. 2.1)*<br>*Location in Order: 14* | Cash advances and other extensions of credit on a senior secured, revolving basis, in an aggregate principal amount not to exceed $8,000,000 from entry of an Interim Order through December 30, 2010 and $6,000,000 thereafter, all subject to a Borrowing Base and consistent with the Budget. |
| Use of Proceeds<br>*Location in DIP Loan Agreement:*<br>*  Pgs. 57 (Sec. 8.4)*<br>*Location in Order:  Pg. 10 (Sec. H)* | Proceeds of the DIP Facility (net of amounts used to pay fees, costs, and expenses under the DIP Financing Agreements) shall be used, in a manner consistent with the terms and conditions of the DIP Loan Agreement, and in accordance with the Budget, as follows: (a) solely for (i) working capital and general corporate purposes, (ii) payment of costs of administration of the case and the carve-out, and (iii) payment of the Adequate Protection Payments, and (b) upon entry of the Final Order, all letters of credit issued and all obligations on account of cash management services and bank products incurred under the Pre-Petition Financing Agreements shall be deemed issued and incurred under the DIP Financing Agreement and deemed to constitute "liabilities" thereunder, and (c) upon entry of a Final Order, payment in full of the remaining |

---

[4] In the event of an inconsistency between the summary of key terms and the DIP Loan Agreement, the DIP Loan Agreement shall govern.

| Reportable Item | Summary |
|---|---|
|  | Pre-Petition Senior Debt. |
| Interest Rate<br>*Location in DIP Loan Agreement:*<br>*Pg. 28 (sec. 2.1)*<br>*Location in Order: N/A* | The higher of (a) the interest rate defined as the "Base Rate" and (b) a fluctuating rate of interest equal to the 30-day LIBOR rate (or an equivalent rate if LIBOR becomes unavailable) <u>plus</u> 2.75% per annum, payable monthly in arrears, calculated on an actual 360 day basis. The Default Interest Rate during the continuance of an "Event of Default," will be at an additional 2.00% per annum. |
| Commitment Fees<br>*Location in DIP Loan Agreement:*<br>*Pg. 28 (Sec. 2.12)*<br>*Location in Order: N/A* | A commitment fee equal to $75,000 will be earned upon execution of the DIP Loan Agreement, and due and payable upon entry of the Interim Borrowing Order. |
| Unused Line Fee<br>*Location in DIP Loan Agreement:*<br>*Pg. 28 (Sec. 2.13)*<br>*Location in Order: N/A* | The unused line fee shall equal .375% per annum of the average difference, during the month just ended, between the Revolving Credit Ceiling and the unpaid principal balance of the Loan Account. |
| Expenses<br>*Location in DIP Loan Agreement:*<br>*Pgs. N/A*<br>*Location in Order: Pg. 34 (sec. (19(b))* | All costs and expenses of the DIP Lender in connection with the DIP Financing Agreements, including, without limitation, reasonable legal, accounting, collateral examination, monitoring, and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out-of-pocket expenses will be paid by the Debtor. |
| Term/Maturity Date<br>*Location in DIP Loan Agreement:*<br>*Definitions, Pg. 18*<br>*Location in Order: Pg. 29 (¶ 13)* | The Maturity Date is the 30th day following execution of the DIP Loan Agreement, unless the Final Order has been entered by such date (and is not stayed, modified, appealed, reversed or otherwise affected), and if the Final Order has been so entered, the Maturity Date shall mean April 29, 2011. |
| Events of Default<br>*Location in DIP Loan Agreement:*<br>*Article XI, Pgs. 64-70*<br>*Location in Order: Pg. 31, ¶ 16* | The DIP Loan Agreement contains events of default customarily found in loan agreements of this nature, including without limitation, the following (i) dismissal of any material portion of the Chapter 11 Cases with respect to any of the Debtors or conversion of any such Chapter 11 Case to a chapter 7 case(s), (ii) appointment of a chapter 11 trustee or examiner or other person with expanded powers, (iii) granting relief from the automatic stay to permit foreclosure on any material asset of any of the Debtors, and (iv) reversal, vacation or stay of the effectiveness of either the Interim Order or Final Order arising with respect to this Motion. |
| Liens/Security<br>*Location in DIP Loan Agreement:*<br>*Pgs. 59-60 (Sec. 9.1)*<br>*Location in Order: Pgs. 15-18 (Secs. 2(e),*<br>*2(i))* | All amounts owing by the Borrower and the Guarantors under the DIP Financing Agreements will be secured by a first priority perfected priming security interest in, and lien on, substantially all of the assets (tangible, intangible, real personal or mixed) of the Borrower, whether now owned or hereinafter acquired, arising, or to become due, or in which that Borrower obtains an interest, and |

| Reportable Item | Summary |
|---|---|
| | all products, proceeds, substitutions, and accessions of or to substantially all assets of the Borrower, including without limitation, accounts, inventory, equipment, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, including the proceeds of any avoidance actions arising under chapter 5 of the Bankruptcy Code, (the "Avoidance Actions"), other general intangibles, and all products and proceeds thereof (the "Collateral"), subject only to (i) Permitted Prior Liens and (ii) the Carve-Out (as defined below); provided, however, that the DIP Collateral shall only include recoveries on account of Avoidance Actions (i) to the full amount of any such recovery or settlement made under Section 549 of the Bankruptcy Code, and (ii) only in an amount necessary to reimburse the Lender for the amount of the Carve-Out, if any, used to finance the pursuit of such recovery or settlement with respect to any other recovery or settlement on account of Avoidance Actions.<br><br>Subject to the Carve-Out, the DIP Lenders will be granted an allowed superpriority administrative expense claim (the "Superpriority Claim") having priority in the Case and any successor case under sections 364(c)(1), 503(b), and 507(b) over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |
| Carve-Out Expenses / Agreed Administrative Expense Priorities<br>*Location in DIP Loan Agreement:N/A*<br><br>*Location in Order: Pgs. 25-28 (Sec. 8)* | Carve-Out Expenses shall mean sums having priority ahead of the super priority administrative expense claims and liens securing the DIP Credit Facility for (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and (ii) accrued and unpaid fees and expenses of attorneys and financial advisors employed by the Debtors and the Committee pursuant to section 327 and 1103 of the Bankruptcy Code, and accrued reasonable expenses of the members of the Committee, in each case to the extent provided for and in amounts not to exceed the amounts contained in the Budget during the period from the Petition Date through the date on which an Event of Default first occurs. |
| Borrowing Conditions<br>*Location in DIP Loan Agreement:*<br>*     Pgs. 30-31*<br>*Location in Order: Pg. 15, (Sec.2 (d))* | The DIP Loan Agreement contains certain customary conditions precedent to entry into the Loan. |
| Business Plan/Budget<br>*Location in DIP Loan Agreement:*<br>*     Pgs. 7, 31 (Sec. 3.10)*<br>*Location in Order: Pg. 19 (¶ 3)* | The Borrower's 13 week cash flow projections in form and substance satisfactory to the Lender. |

| Reportable Item | Summary |
|---|---|
| Adequate Protection of Prepetition Claims<br>*Location in DIP Loan Agreement:  N/A*<br>*Location in Order:*<br>    *Pg. 19-22 (sec. 4(a)-(d)))* | As adequate protection for any diminution in value of the Pre-Petition Collateral (including Cash Collateral), the Pre-Petition Lender shall receive, as adequate protection: (a) Pre-Petition Replacement Liens in the DIP Collateral, junior only to the DIP Liens, the Carve-Out, and Permitted Prior Liens; (b) Pre-Petition Superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code, junior only to the DIP Lien, DIP Superpriority Claim, and Carve-Out; (c) adequate protection payments in the form of (i) proceeds of the DIP Collateral and Pre-Petition Collateral, (ii) upon entry of the Final Order, payment in full of the remaining Pre-Petition Secured Debt, (iii) payment in the amount of interest, fees, costs, expenses (including reasonable attorneys' fees and expenses), indemnities and other amounts with respect to the Pre-Petition Senior Debt, and (iv) all letters of credit issued and all obligations on account of cash management services and bank products incurred under the Pre-Petition Financing Agreement shall be deemed issued and incurred under the DIP Financing Agreements and deemed to constitute liabilities thereunder; and (d) a $100,000 Pre-Petition Indemnity Account established by the Debtors to fund Pre-Petition Indemnity Obligations, payable upon entry of Final Borrowing Order, or upon payment in full of Pre-Petition Secured Debt, whichever is earlier. |
| The validity, enforceability, priority, or amount of prepetition claims<br>*Location in DIP Loan Agreement:*<br>    *Pg. N/A*<br>*Location in Order:  Pgs. 6-8 (Sec. E);*<br>    *19-20 ¶ 4(a) and (b)* | The Borrower stipulates and acknowledges the amount, validity, enforceability, priority and non-avoidability of the claims and liens in respect of the Prepetition Financing Agreements, and waives any and all claims and defenses related to the Lender, Guarantors, and their employees, advisors, attorneys, agents, and representatives arising from or relating to the Pre-Petition Financing Agreements, and provided, however, the stipulation and acknowledgement of the Borrower shall be subject to bankruptcy court approval. |
| Waiver or modification of the automatic stay<br>*Location in DIP Loan Agreement: N/A*<br>*Location in Order: Pg. 37 (sec. 19(n))* | Provisions of automatic stay modified as to Lenders. |
| Waiver or modification of authority or right to file a plan, seek an extension of time as to exclusivity to file a plan, request for the use of cash collateral, or request authority to obtain credit under section 364<br>*Location in DIP Loan Agreement: N/A*<br>    *Pg.*<br>*Location in Order:  Pg. 8 (sec. (E)(vi))* | Until Full Payment of Senior Obligations, the Borrower shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lender or further prime the Pre-Petition Senior Liens beyond what is authorized in the Interim Order and Final Order, by offering a subsequent lender or a party-in-interest a superior or pari passu lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise. |
| Waiver or modification of applicable nonbankruptcy law relating to the perfection of a lien on property, or on the foreclosure or other enforcement of the lien<br>*Location in DIP Loan Agreement:*<br>*Location in Order:*<br>    *Pgs .22-25 (secs. 6 & 7)* | Automatic full perfection of liens granted under the Post-Petition Loan Documents; Limitation of the lesser of seventy-five (75) days from the Petition Date or sixty (60) days from appointment of a committee for parties to challenge validity and priority of securitization of the obligations under the Prepetition Facility and the Senior Secured Notes (the "Investigation Period"). |

| Reportable Item | Summary |
|---|---|
| Release, waiver or limitation on claims or other causes of action belonging to the estate <u>or the trustee</u><br>*Location in DIP Loan Agreement:  N/A*<br>*Location in Order:  Pgs. 22-25 (sec. 6 & 7)* | The DIP Loan Agreement and the Interim Order provide for the Debtors' stipulation to the extent, priority and non-avoidability of the liens and claims of the Pre-Petition Lender subject to the rights of any party in interest to seek to challenge those stipulations prior to the expiration of the Challenge Period. |
| <u>Indemnification</u><br>*Location in DIP Loan Agreement:*<br>*     Pg. 80*<br>*Location in Order: Pgs. 21-22 (sec. 15.12)*<br>*(¶ 4(d))* | The Borrower shall indemnify, defend, and hold harmless the Lender and any Participant and any of their respective employees, officers or agents harmless of and from any claim brought or threatened against such party by the Borrower, any guarantor or endorser of the Liabilities, or any other Person on account of the relationship of any Borrower or any other guarantor or endorser of the Liabilities other than any action brought or investigation conducted pursuant to paragraph 7 of the Borrowing Orders with respect to Challenge Rights, and any claim as to which a final determination is made in a judicial proceeding, which determination includes a specific finding that the Indemnified Person seeking indemnification had acted in a grossly negligent manner or in actual bad faith.<br><br>The Debtors shall establish a $100,000 indemnification reserve for Pre-Petition Indemnity Obligations, provided that the Pre-Petition Indemnity Account shall terminate and the amounts held released to the Debtor upon the earlier of:  the Challenge Termination Date if, as of such date, no party has asserted a claim or cause of action or commenced an adversary proceeding or other challenge as contemplated, or if such challenge has been (i) asserted upon delivery of a release of the claim, or (ii) commenced, upon dismissal with prejudice or entry of final judgment resolving such challenge, or (iii) the date the Court issues a final order closing the case. |
| Release, waiver, or limitation of section <u>506(c) rights</u><br>*Location in DIP Loan Agreement: N/A*<br>*Location in Order: Pgs. 9-10 (sec. G)* | Subject to the entry of the Final Order, no charges permitted against Collateral pursuant to Sections  506(c), 552(b) or 105(a) of the Bankruptcy Code. |
| Granting of liens on claims or causes of action arising under Sections 544, 545, 547, <u>548, 549, 553(b), 723(a), or 724(a).</u><br>*Location in DIP Loan Agreement: N/A*<br><br>*Location in Order: Pg. 16-17 (Sec. 2(e))* | The DIP Collateral shall include recoveries or settlement arising under Chapter 5 of the Bankruptcy Code (i) to the full amount of any such recovery or settlement if made under Section 549 of the Bankruptcy Code, and (ii) only in an amount necessary to reimburse the Lender for the amount of the Carve-Out, if any, used to finance the pursuit of such recovery or settlement with respect to any other recovery or settlement under Chapter 5 of the Bankruptcy Code. |

## JURISDICTION

1.      This Court has jurisdiction to entertain this Motion pursuant to 28 U.S.C. sections 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. section 157(b).

2.      The statutory predicates for the relief sought herein are sections  105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9019, and LBR 4001-2.

## 1.      BACKGROUND

### 2.      History

3.      The Debtors opened their first bookstore in November 1986 in Lexington, KY. The original bookstore was only 6,500 square feet but has since been expanded to approximately 40,000 square feet in space.  Following the success in Lexington, over the last 24 years, the Debtors opened additional stores in Cincinnati, OH (1993), Cleveland, OH (2003), Pittsburgh, PA (2004), Charlotte, NC (2005) and Fredericksburg, VA (2010).   Joseph Beth also bought Davis-Kidd Booksellers stores when the owners of David-Kidd decided to retire from the business in 1997.  Davis-Kidd Booksellers are currently open in Nashville and Memphis, TN (all the above referenced stores are collectively, the "Bookstores").

4.      Each of the locations is a full-service bookstore.  Along with selling books, the stores also contain music, magazine, and children's sections and other consumer products such as calendars, stationery, greeting cards and gifts.  Books currently represent approximately 55% of total sales.  Many of the locations also have an attached café, "Bronte," that serves breakfast, lunch and dinner, including coffee and other snack items (the "Cafes").

5.      In November 2009, the Debtors opened the first Joseph-Beth Health & Well-Being Store at the Cleveland Clinic in Cleveland, OH ("Joseph-Beth Health").  Joseph-Beth

Health provides a selection of books, gifts, health foods and other healthy living products for visitors, medical professionals and employees at the Cleveland Clinic.

        3.       **Corporate and Capital Structure**

        6.       JB Booksellers, Inc. ("JB Inc."), a Kentucky Corporation, is the parent company and is 100% owned by Neil Van Uum, who is also the Chief Executive of Joseph-Beth. JB Inc. has a 99% membership interest in Joseph-Beth Booksellers, LLC ("Joseph-Beth"), a Tennessee Limited Liability Company, and a 75% membership interest in Joseph-Beth Café, LLC ("JB Café"), a Tennessee Limited Liability Company. The remaining 1% interest in Joseph-Beth is owned and controlled by General Benton Smith, Inc. ("GBS"), an affiliate of Ingram Book Group Inc. ("Ingram"). The remaining 25% interest in JB Cafes is owned by Neil Van Uum.

        7.       Joseph-Beth is the operating entity for the Bookstores and Joseph-Beth Health. The Cafes are managed by JB Café pursuant to a Management Agreement entered into by and between Joseph-Beth and JB Café.

        8.       Joseph-Beth is the primary obligor on a $7.5 million revolving line of credit (the "Pre-Petition Facility") with Webster Business Credit Corporation (the "Pre-Petition Lender" and together with Ingram, the "Senior Secured Lenders") as the lender, secured by substantially all assets of the Debtors (the "Pre-Petition Collateral"). The Pre-Petition Facility is subject to computations of borrowing availability based upon collateral valuations ("Borrowing Base") and includes various financial performance covenants. Proceeds from retail sales are paid directly to the Pre-Petition Lender and advances are made to the Debtors on an almost daily basis for the payment of obligations, subject to the Borrowing Base. Pursuant to the terms of a Junior Participation Agreement (the "Participation Agreement"), Ingram is a junior participant under the Pre-Petition Facility and provides a $4 million letter of credit, which may be drawn by the Pre-

Petition Lender upon a default under the Pre-Petition Facility.  As a result of a violation of the EBITDA covenant, Joseph-Beth is currently in default under the terms of the Pre-Petition Facility.

9.      JB Inc. and JB Café are each corporate guarantors of the Pre-Petition Facility, and JB Inc. has pledged its membership interest in Joseph-Beth and JB Café to the Lender and GBS.

10.      In addition to Ingram's participation in the Pre-Petition Facility, Ingram has been the primary book wholesaler of Joseph-Beth, and in that capacity, the parties have entered into multiple agreements to define the relationship.  Among the agreements are a Memorandum of Understanding (the "Memorandum of Understanding"), an Agreement to Open Stores and Reduce Account (the "Open Stores Agreement"), a Consignment and Vendor Managed Inventory Agreement (the "Consignment Agreement"), and a Security Agreement (the "Ingram Security Agreement").

11.      The Memorandum of Understanding and Open Stores Agreement were entered in November, 2009 and set forth the terms and conditions of Joseph-Beth's inventory from Ingram and the pricing, discounts, and return policy, among other items.  The agreements also set forth a reduction in the amounts due and owing Ingram, seeking to reduce the amount from $7 million to $3 million over a 16 month period.  As the primary provider of books, Joseph-Beth has historically purchased approximately $700,000 in inventory from Ingram on a monthly basis. Currently, the Debtors owe Ingram approximately $3.5 million as accounts payable (excluding any amounts due Ingram on account of the Revolving Facility, the "Ingram Payable").  The Ingram Payable is subject to the Ingram Security Agreement, which grants Ingram a lien on all assets of Joseph Beth.  Ingram's security interest is subject to an Intercreditor Agreement (the "Intercreditor Agreement") entered by and between Ingram and the Lender.  The Intercreditor

Agreement sets forth the rights of the parties to proceeds from the Debtors, and priorities of their respective security interests.  Under the Intercreditor Agreement, the Pre-Petition Lender has a first position priority security interest on substantially all assets and Ingram is subordinate to the Pre-Petition Lender's interest.

12.    Under the Consignment Agreement, the majority of the book inventory located in Pittsburgh and Charlotte are sold on consignment.  Ingram has perfected its consignment interest in this inventory, and retains a first priority security interest in substantially all book inventory at these two stores.

13.    While the Pre-Petition Lender and Ingram have first and second priority interests in substantially all of the assets of Joseph-Beth and the corporate guarantors, many of the stores also have fixtures, furniture and equipment that are subject to purchase money security interests and/or fixture filings.  As a result, the Debtors secured debt includes the $7.5 million Revolving Facility, the $3.5 million Ingram Payable, and $310,000 in other secured obligations.

14.    In addition to the secured obligations, the Debtors carry approximately $3.5 million in pre-petition unsecured debt, exclusive of any lease rejection damages which may arise during the pendency of these bankruptcy cases.

4.    **Events Leading to Chapter 11**

15.    Over the last seven years, Joseph-Beth expanded from its original four stores, each of which was an early adopter to the full-service bookstore model and able to establish themselves in their home markets.  This expansion, to nine stores, began in 2003 with the opening of the Cleveland store.  Unfortunately, the newer stores entered into a market that was highly competitive, and Joseph-Beth lacked the name recognition and national reputation of certain competitors. While the older stores have generally continued to perform well during this

period of change in the habits of book buyers, many of the newer stores have not been able to establish themselves, and have fallen short of expectations. The expansion efforts, however, required incurring significant amounts of secured and unsecured debt to open these newer stores. As a result of the high leverage created by the expansion, carrying multiple stores that are unable to contribute positive margins to the bottom line, the general economic conditions and increased competition, the Debtors ultimately found themselves in violation of certain financial covenants in their Revolving Facility.

16.    In June of 2010, the Debtors failed to meet a trailing twelve month EBITDA covenant in its Revolving Facility.    In the ensuing months, the Debtors had continuing discussions with their Secured Lenders regarding their restructuring alternatives.  As the holidays approached, the discussions became more urgent, as it was apparent that the Debtors would require additional liquidity in order to have adequate inventory available for the holiday shopping season.

17.    Recently Joseph-Beth was informed that the Lender would not increase the Debtors availability under the Revolving Facility nor would the Lender continue to make advances under the Revolving Facility outside of a bankruptcy process.  Without access to additional cash and facing the prospect of losing the availability of store generated cash, the Debtors determined that a filing under chapter 11 of the United States Bankruptcy Code was the best option available to continue operations at the successful stores and liquidate the unsuccessful stores, and was in the best interest of the estates and their creditors.

5.    **Restructuring Plan**

18.    Prior to the bankruptcy filing, the Debtors undertook an extensive review and evaluation of each of the Bookstores and the ability of each to be a successful part of a profitable

and successful reorganized entity.  After this extensive review, the Debtors identified four stores that  do not provide significant positive contribution margins and are therefore slated to be closed:  Charlotte, NC; Cleveland, OH; Nashville, TN; and Pittsburgh, PA (collectively, the "Closing Stores").  In Charlotte and Pittsburgh, the majority of the inventory is on consignment from Ingram.  As a result, these stores have begun storewide sales and will be closed by the Debtors on-site personnel in the coming days.  The consigned inventory has been returned to Ingram and the remaining inventory will be sold until such time as the value of closing the stores exceeds the benefits of maintaining the sales.  Upon completion of the inventory reduction sale, the remaining inventory will be shipped to continuing stores.  The stores in Cleveland and Nashville will be closed with the assistance of a national retail liquidation specialist, subject to the terms of the proposed order on the forthcoming Store Closing Motion, which the Debtors anticipate filing in the next couple days.  Each of the Closing Stores will be closed, and the leases rejected, prior to the end of 2010.

19.    While the Debtors continue negotiations with landlords regarding lease accommodations, the remaining Bookstores, in Cincinnati, OH; Fredericksburg, VA; Lexington, KY; and Memphis, TN plus Joseph-Beth Health (the "Continuing Stores") have been determined to have potential value as continuing stores and the Debtors believe each will be part of a successfully reorganized entity.  The Continuing Stores have withstood the negative impact of the various macroeconomic factors including the recession, internet sales and e-readers, as well as the microeconomic factors including liquidity constraints and restructuring initiatives.  Despite all the pressures applied to these stores, same store sales are expected to decrease by less than 7% for calendar year 2010 at the Continuing Stores.  The Continuing Stores account for 65% of pre-petition sales volumes and over 100% of the previous store contribution margin.

20.     In order to pursue a successful reorganization while maintaining operations at the Continuing Stores, the Debtors have successfully negotiated a Debtor-in-Possession Revolving Financing Facility (the "DIP Facility") with Webster Business Capital Corporation (in this capacity, the "DIP Lender").  Under the terms of the DIP Facility, the Debtors will increase their current availability, which will permit proper inventory management during the holiday season and, together with the funds made available through the Store Closing Sales, will provide the Debtors adequate liquidity into the new year, when inventory is depleted and seasonal sales are lower.  The DIP Facility will provide additional security to current and future vendors in the ability of the Debtors to make post-petition payments and provide time for the Debtors to finalize a long-term solution that will benefit the Debtors, their estates, and other parties in interest.

## **REQUESTED RELIEF**

21.  As noted, the Debtors seek entry of an Interim Order substantially in the form attached hereto as Exhibit A:

6.     (a)     authorizing the Debtors, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, to obtain debtor-in-possession financing in accordance with the terms of the DIP Facility from the DIP Lender pursuant to the terms and conditions of the DIP Loan Agreement and the DIP Financing Agreements, including, as necessary the entry into any and all Ratification Agreements as may be necessary to document the terms and conditions thereof;

7.     (b)     granting the Lender a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, subject only to the Carve-Out and Permitted Prior Liens;

8.    (c)    granting the DIP Lender valid, enforceable, and fully-perfected first priority priming liens, subject only to the Carve-Out and the Permitted Prior Liens, upon all of the Debtors' real and personal property as provided in and contemplated by the Interim Order and DIP Financing Agreements;

9.    (d)    granting the Pre-Petition Lender the Pre-Petition Replacement Liens, the Pre-Petition Superpriority Claim, and the Adequate Protection Payments as adequate protection for any decrease in the value of the Pre-Petition Collateral on account of the granting of the DIP Liens to the DIP Lender, subordinating the Pre-Petition Senior Liens to the Carve-Out, the Debtors' use of the Pre-Petition Collateral, including Cash Collateral, or the imposition of the automatic stay;

10.    (e)    finding that, pursuant to Bankruptcy Rule 4001(c)(1), notice of the Interim Hearing is sufficient and adequate and no other or further notice is required;

11.    (f)    scheduling and approving the form of the Final Order and manner of notice of the final hearing; and

12.    (g)    granting such further and related relief as the Court deems just and equitable.

## THE DIP LOAN AGREEMENT

22.  The Debtors have determined that, under the current circumstances, the post-petition financing proposal made by the Lender most clearly satisfies the Debtors' financing needs and establishes necessary support at the outset of these cases to permit the Debtors time to seek a successful reorganization of their ongoing business operations.

23.  The Debtors and the Lender engaged in substantial negotiations over the terms of the Interim Order and the DIP Loan Agreement.  Those negotiations were extensive, comprehensive, at arm's length and in good faith.  The Debtors used their best efforts to

negotiate the elimination, or narrowing of those provisions implicating issues that are the subject of Bankruptcy Rule 4001(c)(1)(B) and LBR 4001-2.   Nevertheless, there remain a limited number of provisions in the Interim Order and the DIP Loan Agreement that are required to be highlighted by those Rules (the "4001-2 Provisions").  The Lender has requested Court approval of the 4001-2 Provisions as a condition for providing the financing under the DIP Facility. Based upon the totality of the circumstances, the Debtors submit that such protections are appropriate and in the best interest of the creditors of these estates.   Moreover, the 4001-2 Provisions are by no means uncommon to debtor-in-possession financing of the nature that is before the Court.

24.  The Debtors submit that the 4001-2 Provisions are appropriate because of the (i) Debtors' inability to obtain post-petition financing on equal or better terms and (ii) the instant need for access to the additional liquidity in advance of the retail holiday season.  The Debtors' assets are completely encumbered by first and second liens in favor of the Pre-Petition Lender and Ingram.  The Debtors do not believe that discussions with other potential lenders would yield terms that would be considerably more favorable than those offered under the proposed DIP Facility.   The Lender therefore, when considering the restructuring as a whole, offered the Debtors the most attractive terms upon which to obtain post petition financing.  Without access to the financing, certain vendors may be unwilling to continue business with the Debtors, and the Debtors would therefore face substantially more obstacles and uncertainty in attempting to maintain going-concern stores open and competitive on a post petition basis.  The Debtors therefore believe that the terms of the DIP Loan Agreement and DIP Facility are fair and justified under the circumstances.

## DEBTORS' ATTEMPTS TO OBTAIN CREDIT

25.   Prior to the Petition Date, the Debtors evaluated all of their options with respect to having sufficient resources to operate post-petition including the risks and benefits of operating on cash collateral, and attempted to obtain post petition financing proposals from other lenders. The Debtors were unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under section 364(a) or (b) of the Bankruptcy Code, or secured credit pursuant to section 364(c)(1) of the Bankruptcy Code, recognized the benefits of the additional availability and the confidence instilled by having DIP financing.  In addition, due to their financial constraints, the Debtors are presently unable to obtain, in the ordinary course of business or otherwise, credit allowable under sections 364(c) or 364(d) of the Bankruptcy Code, except from the Lender on the terms and conditions contained in the DIP Loan Agreement.

26.   Before deciding to enter into the DIP Loan Agreement, the Debtors and the Lender engaged in arms' length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law.   Based on the totality of the circumstances, the Debtors were unable to obtain proposals for post petition financing on terms and conditions more favorable to the Debtors' estates than those set forth in the DIP Loan Agreement.  Any credit extended by the Lenders on or after the Petition Date pursuant to the terms of the DIP Loan Agreement and an order of this Court approving the DIP Loan Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

27.   Accordingly, the Debtors have determined, in the exercise of their respective best and reasonable business judgment, that the financing to be provided by the Lenders is the most favorable funding available under the circumstances and addresses the Debtors' immediate necessary financing needs while they reorganize their business.  The financing available under

the DIP Loan Agreement will enable the Debtors, among other things, to maintain good relationships with the majority of its vendors, provide added confidence to employees and customers and avoid the cessation of their ongoing operations, and maximizing the value of their business as a going.

### APPROVAL OF THE DIP LOAN AGREEMENT IS
### WARRANTED UNDER THE CIRCUMSTANCES AND APPLICABLE LAW

#### A.     Approval Pursuant to 11 U.S.C Section 364(c)

28.   Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. In re Simasko Production., 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtors' best business judgment indicated financing was necessary and reasonable for benefit of estate); Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to DIP Loan, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); see also Collier on Bankruptcy, ¶ 364.05 (15" ed. Rev.). Section 364(c) of the Bankruptcy Code provides in pertinent part:

(c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

(1)     with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. section 364(c).

29.   In satisfying the standards of section 364(c), a debtor need not seek credit from every available source but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (11th Cir. 1986) (trustee demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); see also Ames, 115 B.R. at 40 (debtors demonstrated the unavailability of unsecured financing where debtors approached several lending institutions); In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (same); In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

30.   Courts have articulated a three-part test to determine whether a debtor in possession is entitled to financing under section 364(c) of the Bankruptcy Code: (i) whether the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim; (ii) whether the credit transaction is necessary to preserve the assets of the estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. See, e.g., In re Farmland Indus., Inc., 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003); In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Ames Dep't Stores. Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y.

1990); In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987); In re Secured Storage

Systems, No. 91-14262S, 1992 WL 109064, at *1 (Bankr. E.D. Pa. May 15, 1992).

## NEED FOR FINANCING

31.    Unless the Debtors are authorized to obtain the financing requested herein, the

Debtors face significant risks that their primary inventory vendors will no longer do business

with the Debtors, employees will have added concern with respect to their job security, and

customers may purchase their books, music and gift items elsewhere.    Additionally, the

additional liquidity in this holiday season will allow the Debtors to maintain ordinary and

consistent inventory levels moving forward.  Ultimately, the DIP Facility will provide necessary

comfort of the Debtors' ability to maintain business relationships with vendors, suppliers, and

customers, to pay their employees, and to otherwise fund their operations, which is essential to

the Debtors' continued viability and preservation and maintenance of the going concern value of

the Debtors' business.

## NO MORE FAVORABLE ALTERNATIVE FINANCING IS AVAILABLE

32.    The Debtors are unable to obtain credit that is not both secured and entitled to

superpriority administrative claim status from any other financing source. As noted above, the

Debtors' obligations under the Pre-Petition Facility and under the Ingram Payable are secured by

substantially all of the Debtors' assets. Under these circumstances, and given the Debtors'

current financial status, the Debtors believe that no lender would provide financing to the

Debtors other than on a secured and superpriority basis.  The Debtors made efforts to negotiate

alternative debtor in possession financing arrangements with the Lender, and with other entities.

No lender offered financing on terms that, taken as a whole, were better than those provided

under the DIP Loan Agreement.  Thus, the Debtors can show "by a good faith effort that credit

was not available without" the protections of section 364(c) of the Bankruptcy Code.  Snowshoe,

789 F.2d at 1088.  Accordingly, the Debtors believe that the financing arrangement proposed under the DIP Loan Agreement represents the best available to them at this time.

## THE FINANCING IS FAIR AND REASONABLE

33.  The Debtors believe that the terms of the DIP Financing Agreements and Interim Order are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Financing Agreements and the Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and the Lender, with all parties represented by counsel.  Accordingly, the Debtors believe that any credit extended under the terms of the Interim Order is extended in good faith by the Lender as that term is used in section 364(e) of the Bankruptcy Code.

34.  Given the Debtors' current financial status, the Debtors are unable to obtain credit that is not secured with a priming lien above that of the Pre-Petition Lender and the Ingram Payable.  Accordingly, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Loan Agreement is the best alternative available under the circumstances.  Bankruptcy Courts routinely defer to the Debtors' business judgment on most business decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not this Court"); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estates, and threaten the court's ability to control a case impartially."); Richmond Leasing  Co. v. Capital Bank, N.A.,

762 F.2d 1303, 1311 (5th Cir. 1985).  In addition, the fees and charges required by the Lenders are appropriate and reasonable under the circumstances of this case.  See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing such lender enhancement fees).

35.   Unless the decision is arbitrary and capricious, a bankruptcy court should defer to a debtor's business judgment regarding the need for, and the proposed use of, the requested funds. In re Curlew Valley Assoc., 14 B.R. 507, 511-13 (Bankr. D. Utah 1981).   Bankruptcy Courts will generally not second guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Id. at 513-14 (footnotes omitted).

36.   In the instant case, the Debtors have exercised sound business judgment by seeking advice from their legal and financial advisors in making the determination that the DIP Loan Agreement and related DIP Financing Agreements are fair and reasonable and in the best interest of the Debtors' estates.   Accordingly, the Debtors should be granted authority under section 364(c) of the Bankruptcy Code to enter into the DIP Loan Agreement and borrow funds from the Lenders on the basis described herein and in the DIP Financing Agreement, on a super-priority basis.

**B.     Approval Pursuant to 11 U.S.C Section 364(d)**

37.   Section 364(d) of the Bankruptcy Code provides that:

> (d)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (1)     the trustee [or debtor in possession] is unable to obtain such credit otherwise; and
>
> (2)     there is adequate protection of the interest of the holder so the lien on the property of the estate on which such senior or equal line is proposed to be granted.

Case 10-53593-tnw   Doc 8   Filed 11/11/10   Entered 11/11/10 12:18:01   Desc Main
Document       Page 23 of 31


11 U.S.C. § 364(d).

38.   Hence, absent consent, in order or to obtain what is commonly referred to as a "priming lien," the Debtors are required to establish that (i) there was no other alternative to the DIP Loan Agreement and (ii) the interests of the senior lien holders being "primed" will be adequately protected in the face of the proposed loan.  In re First South Sav. Ass'n, 820 F.2d 700 (5th Cir. 1987); In re W&W Protection Agency, Inc., 200 B.R. 615, 623 (Bankr. S.D. Ohio 1996).

39.   The Pre-Petition Lender consents to the adequate protection and the priming provided for herein; provided, however, the Prepetition Lender's consent to the priming, and the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of an Interim Order (in form and substance satisfactory to them) relating to the DIP Loan Agreement and the DIP Financing Agreements.

## 11 U.S.C. SECTION 361 - ADEQUATE PROTECTION

40.   The term "adequate protection" is not expressly defined by the Bankruptcy Code. See In re Estes, 185 B.R. 745 (Bankr. W.D. Ky. 1995); In re Carter, 1994 U.S. Dist. LEXIS 20573 at *11 (W.D. Ky., June 17, 1994).  However, when adequate protection is required under sections 362, 363, or 364 of the Bankruptcy Code of an interest of an entity in property, adequate protection may be provided by:

a)   requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

b)   providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

c)   granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the "indubitable equivalent" of the entity's interest.

23

11 U.S.C. § 361.

41.    Since the Bankruptcy Code does not *expressly* define "adequate protection," the methods listed under section 361 by which adequate protection may be provided to a secured creditor are neither exclusive nor exhaustive; hence, a bankruptcy court may accept a method of adequate protection that does not fall under any of the methods set forth in section 361.  See In re Estes, 185 B.R. 745 (Bankr. W.D. Ky. 1995); In re Carter, 1994 U.S. Dist. LEXIS 20573 at *11 (W.D. Ky., June 17, 1994) (the methods of compensation listed in section 361 are neither exclusive nor exhaustive).

42.    In fact, what constitutes adequate protection is a question of fact that is to be determined by the court on a case-by-case basis.  In re Rocco, 319 B.R. 411 (Bankr. W.D. Pa. 2005).  It was the intent of Congress in section 361 to give courts flexibility to fashion relief in light of each case in general equitable principals.  In re Wilson, 30 B.R. 371 (Bankr. E.D. Pa. 1983).  As a result, courts have developed general principals to guide the adequate protection determination.  What constitutes adequate protection is determined on a case-by-case basis, and the equitable factors which the court might consider include: (1) whether the claim is over or under secured, (2) the parties reasonable expectations, (3) the quality of the collateral, (4) the length of the stay, (5) whether the lien value is stable, depreciating or appreciating, (6) whether taxes and other payments are being made on the collateral and (7) whether the debtor has a high or low chance of reorganization.  See In re Briggs Transp. Co., 780 F.2d 1339 (8th Cir. 1985).

43.    "The purpose of adequate protection is to provide a secured creditor the benefit of its bargain while enabling the debtors to use the secured property; it is not intended as an 'after the fact' method of allowing creditors to obtain the full amount of secured claims."  In re Carter, 1994 U.S. Dist. LEXIS 20573 at *12 (W.D. Ky., June 17, 1994).  Furthermore, "'[w]hile an

equity cushion is generally considered prima facie evidence of adequate protection, the absence

of an equity cushion does not establish the converse.'" Id.   A "'creditor's right to adequate

protection is limited to the lesser of the value of the collateral or the amount of the secured claim

. . . [and] to the extent that the [creditor's] lien claims exceeded the value of the Debtor's

collateral on the day of filing, the claim was an unsecured claim . . . one which was not entitled

to adequate protection.'"   In re Delbridge, 104 B.R. 824 (E.D. Mich. 1989) (internal citations

omitted).

    44.   Further, there are two recognized policies underlying Chapter 11, "preserving going

concerns and maximizing property available to satisfy creditors."   Bank of America National

Trust and Savings Assoc. v. North LaSalle Street Partnership, 526 U.S. 434, 453 (1999).

Preserving the going concern value of a business essentially ensures additional adequate

protection to creditors in most cases; as the going concern value is typically always higher than

the piecemeal liquidation of assets.   In fact, experience has demonstrated that the sale of a

business as an operating unit enhances value more than the piecemeal sale of particular assets.

Texaco, for example, filed for bankruptcy in the face of a $10.53 billion judgment to Pennzoil.

In re Texaco, Inc., No. 87-20142 (HS) (Bankr. S.D.N.Y. 1987). When Texaco filed for

bankruptcy, no one thought for a moment that the giant oil company would be shut down and its

assets scattered to the winds. Parties realized that the going concern value would bring about a

higher recovery to creditors.   See also In re WorldCom, Inc., No. 02-13533 (AJG) (Bankr.

S.D.N.Y. 2002) (fraud); In re Bethlehem Steel Corp., No. 01-15288 (BRL) (Bankr. S.D.N.Y.

2001) (pension liability).   In each case, it was recognized that the going concern value of the

business preserved value for the benefit of the creditors.   "The preservation and maintenance of

the going concern value of the Debtor is integral to a successful reorganization of the Debtor

pursuant to the provisions of the Chapter 11 and the Bankruptcy Code." <u>In re Western Pacific Airlines, Inc.</u>, 223 B.R. 567, 568 (Bankr. Co. 1997). Such is the case in this instant matter.

45. In light of the above, the Debtors propose to grant to the Prepetition Secured Parties the following as adequate protection within the meaning of section 361:

a) <u>Specific Adequate Protection to the Prepetition Lender in regards to the Prepetition Facility</u>. As adequate protection for any diminution in value of the Pre-Petition Collateral (including Cash Collateral), the Pre-Petition Lender shall receive, as adequate protection: (a) Pre-Petition Replacement Liens in the DIP Collateral, junior only to the DIP Liens, the Carve-Out, and Permitted Prior Liens; (b) Pre-Petition Superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code, junior only to the DIP Lien, DIP Superpriority Claim, and Carve-Out; (c) adequate protection payments in the form of (i) proceeds of the DIP Collateral and Pre-Petition Collateral, (ii) upon entry of the Final Order, payment in full of the remaining Pre-Petition Secured Debt, (iii) payment in the amount of interest, fees, costs, expenses (including reasonable attorneys' fees and expenses), indemnities and other amounts with respect to the Pre-Petition Senior Debt, and (iv) all letters of credit issued and all obligations on account of cash management services and bank products incurred under the Pre-Petition Financing Agreement shall be deemed issued and incurred under the DIP Financing Agreements and deemed to constitute liabilities thereunder; and (d) a $100,000 Pre-Petition Indemnity Account established by the Debtors to fund Pre-Petition Indemnity Obligations, payable upon entry of the Final Borrowing Order, or upon payment in full of Pre-Petition Secured Debt, whichever is earlier.

b) <u>Preservation of Going Concern Value of Business for benefit of Pre-Petition Lender and Ingram</u>. Permitting the Debtors to enter into the DIP Loan Agreement will preserve the going-concern value of the Debtors' business and in doing so preserve the value of the secured parties' interests more so than would be obtained through an immediate liquidation. If this Motion is denied, the Debtors will be forced to close and liquidate its remaining operations, which will result in an immediate, irreparable and significant decrease in the value of the operation and lead to a decreased recovery for the Senior Secured Lenders. In light of the fact that these chapter 11 cases are still in their embryonic stage and they are facing immediate and irreparable harm by being forced to close their doors and liquidate all inventory unless they obtain some temporary relief designed to prevent closing, it is only reasonable that this Court provide the Debtors a period of time in which to attempt to salvage the going concern value. As courts have found, "[i]t would appear that a sale by a going concern . . . would produce a more favorable result than a replevin action or a liquidation sale." <u>In re Staufen's Music House, Inc.</u>, 213 B.R. 842, 844 (Bankr. E.D. Mo. 1997). Under the fact of the instant case, it is readily apparent that the going concern value of the Debtors would far exceed the piecemeal liquidation of the assets.

     c)     <u>Covenant Compliance</u>.  As additional adequate protection for the use of the Pre-Petition Collateral (including the Cash Collateral) by the Debtors, irrespective of whether or not the commitments under the DIP Financing Agreements has terminated in accordance with their own terms, (1) the Debtors shall remain in compliance with each negative covenant and affirmative covenant under the DIP Financing Agreements (subject to any modifications, amendments, consents or waivers made in accordance with the Interim DIP Order) and (2) the Debtors shall ensure that no Event of Default under the DIP Financing Agreements occurs.  If the commitments under the DIP Financing Agreements have terminated in accordance with their own terms or if the Debtors' obligations thereunder are no longer outstanding, then the negative covenants and affirmative covenants and Events of Default referenced herein shall mean those set forth in the DIP Financing Agreements.

**FAR REACHING NEGATIVE EFFECT OF FAILURE TO OBTAIN<br>
<u>APPROVAL OF DIP LOAN AGREEMENT</u>**

46.  The Debtors' inability to utilize the funds made available pursuant to the DIP Loan Agreement will immediately create substantial issues with Debtors' ability to provide the stores with adequate inventory, create customer dissatisfaction and, ultimately could cause the cessation of their operations and result in a complete liquidation of all stores, which will have far reaching negative ramifications including the dismissal of the Debtors' approximately 300 remaining employees.  Additionally, the value of the Debtors' going concern operations will plummet overnight.  Accordingly, the only way to protect the value of the Pre-Petition Collateral to the fullest extent possible is for the Debtors to obtain the debtor in possession financing provided by the DIP Facility.

**C.    DIP Loan Agreement Negotiated in Good Faith**

47.  The Debtors, in the exercise of their prudent business judgment and consistent with their fiduciary duties, have concluded that the terms of the DIP Loan Agreement are reasonable under the circumstances, competitive in today's marketplace, and address the Debtors' working capital and liquidity needs. The DIP Loan Agreement was negotiated in good faith and at arms' length by all parties. The Debtors were assisted in the negotiations by sophisticated and

experienced financial advisors and counsel. Based on the good faith efforts of the Debtors and

the Lender in negotiating a financing arrangement that will benefit the Debtors, their estates and

their creditors, the Debtors respectfully request that the Lender receive the protections of

Bankruptcy Code section 364(e) with respect to the DIP Loan Agreement.

**D.      Summation**

48.      In the Debtors' business judgment, the DIP Loan Agreement is clearly necessary to

preserve the assets of the Debtors' estates and the terms pertaining thereto are fair and

reasonable. The Debtors have no unsecured cash with which to operate following the Petition

Date. The DIP Loan Agreement provides sufficient availability by providing the Debtors with

continued borrowing capacity so that they can have sufficient funds with which to operate their

business. The Debtors require immediate access to the funds available under the proposed DIP

Loan Agreement in order to ensure that their business operations continue uninterrupted and that

their inventory levels and business operations are maintained and enhanced for the benefit of

their estates, their creditors and their employees.

49.      The Debtors' suppliers may not release shipments or may offer the Debtors less

favorable payment terms if the DIP Facility is not approved. These funds are necessary for the

Debtors to meet their liquidity and capital needs in the immediate future pending a final hearing

on the Motion. Without immediate access to these funds the Debtors would not be able to meet

their customer commitments, pay employee wages and benefits, or pay their post-petition

ordinary course of business obligations. Any potential disruptions of the Debtors' operations

would be devastating and create irreparable damage to the Debtors' going concern value and its

estates at this critical juncture.

50.      The inability of the Debtors, without the proceeds from the DIP Facility, to make

timely payments on certain obligations will result in a permanent and irreversible loss of

business for the Debtors, causing a loss of value to the detriment of the Debtors and all parties in interest in these Chapter 11 Cases. Finally, the Debtors anticipate that the approval and implementation of the DIP Loan Agreement will be viewed favorably by the Debtors' employees, suppliers and customers and thereby greatly enhance the Debtors' reorganization efforts. In short, the ultimate success of the Debtors' reorganization hinges upon entering into and drawing funds under the DIP Loan Agreement.

51.    For the reasons discussed above, the Debtors submit that they have exercised sound business judgment in determining that the DIP Loan Agreement represents the best available financing available, is in the best interest of the estates, and contains terms that are fair and reasonable under the circumstances. Accordingly, the Debtors request authority to enter into the DIP Loan Agreement, borrow funds from the Lender thereunder, and take the other actions contemplated and requested herein.

## FINAL HEARING AND NOTICE

52.    Pursuant to Bankruptcy Rule 4001(b), a final hearing on this emergency motion to borrow funds under a post-petition financing arrangement may not be commenced earlier than fifteen days after the service of such motion. Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on such motion and authorize the obtaining of credit necessary to avoid immediate and irreparable harm to the debtor's estate. Fed. R. Bankr. Proc. 4001(b)(2).

53.    As noted above, it is critical to the success of these Chapter 11 Cases that the Debtors be able to obtain debtor in possession financing. Based on the current status of the Debtors' business, it is also critical that the Debtors be permitted to enter into such financing facilities and to draw funds thereunder sooner than the 15 days' notice required under Bankruptcy Rule 4001 for a final hearing on this Motion in order to operate their business and

preserve value at this critical juncture. The Debtors believe that they will suffer immediate and irreparable harm in the absence of an interim hearing and approval of interim borrowings under the DIP Facility.

54.   The Debtors request that the Court (a) conduct an expedited hearing with respect to the Interim Financing Order (as described herein) and (b) schedule the Final Hearing on the Final Order at the earliest possible date in accordance with Bankruptcy Rule 4001(b), but in no event later than twenty-five (25) days from entry of the Proposed Order on an interim basis.

## 13.   NOTICE

55.   No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.  A copy of the Motion was served upon: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to Lender; (iv) counsel to Ingram; (v) the Office of the United States Trustee, Eastern District of Kentucky; (vi) holders of the 30 largest unsecured claims; (vii) all creditors known to Debtors who have, or may have liens against any of Debtors' assets, and (viii) all applicable state and federal taxing authorities.  In light of the requested relief, the Debtors submit that no further notice is required.

## NO PRIOR REQUEST

56.   No prior request respecting the relief sought herein has been submitted to this or to any other Court granting the relief requested herein.

## NOTICE OF HEARING

57.   Notice is hereby given that the foregoing Motion will be heard by the Court on November 12, 2010 at 10:30 a.m. (ET) or as soon thereafter as counsel may be heard in the United States Bankruptcy Court, 3rd Floor Courtroom, 100 East Vine Street, Lexington, Kentucky 40507.

**WHEREFORE**, the Debtors respectfully request that this Court enter the Proposed Order in the form attached hereto as Exhibit A: (a) authorizing the Debtors to obtain post-petition secured and superpriority financing on an interim basis as set forth in the DIP Loan Agreement; (b) scheduling a final hearing; (c) approving the form and manner of notice of final hearing; and (d) granting other related relief.

Dated:  November 11, 2010                    Respectfully submitted,
       Lexington, Kentucky

                                   DINSMORE & SHOHL LLP

                                   */s/      Ellen Arvin Kennedy*
                                   Ellen Arvin Kennedy (KY# 88347)
                                   Lexington Financial Center
                                   250 West Main Street, Suite 1400
                                   Lexington, KY  40507
                                   Telephone:  859-425-1000
                                   Facsimile:  859-425-1099
                                   ellen.kennedy@dinslaw.com

                                   Kim Martin Lewis (OH #0043533)
                                   Patrick D. Burns (OH #00081111)
                                   1900 Chemed Center
                                   255 East Fifth Street
                                   Cincinnati, Ohio  45202
                                   Telephone:  (513) 977-8200
                                   Facsimile:  (513) 977-8141
                                   kim.lewis@dinslaw.com
                                   patrick.burns@dinslaw.com

                                   Proposed Counsel for Debtors and
                                   Debtors-in-Possession