## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

| | |
|---|---|
| In re:<br><br>**JB BOOKSELLERS, INC., a Kentucky corporation,**<br><br>Debtor[1] | **Chapter 11**<br><br>**Case No. 10-53593 (tnw)**<br><br>**Jointly Administered** |

## ORDER PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE (A) AUTHORIZING THE SALE OF ASSETS OF THE DEBTORS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (B) APPROVING ASSET PURCHASE AGREEMENT; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) AUTHORIZING DEBTORS TO ENTER INTO A STORE CLOSING AGREEMENT IN CONNECTION WITH STORE CLOSING SALE; (E) AUTHORIZING THE DEBTORS TO CONDUCT A STORE CLOSING SALE AT THE DEBTORS' LIQUIDATING LOCATION FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (F) GRANTING ANCILLARY AND OTHER RELATED RELIEF

**THIS MATTER** is before this Court on the Debtors' Motion for Order Pursuant to Sections 105, 363, 365, 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (A) Approving Bidding Procedures for the Sale of the Debtors' Assets; (B) Scheduling an Auction and Hearing to Approve the Transaction and Approving the Form and Manner of Notice Thereof; and (C) Establishing Procedures Relating to the Rejection or Assumption and/or Assignment of Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts (as amended and supplemented, the "Motion")[2] [DE 416, 439 and 440] filed by the above-captioned Debtors and Debtors in Possession (the "Debtors), the Court having previously

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: JB Booksellers, Inc. (5130); Joseph-Beth Booksellers, LLC (6343); and Joseph-Beth Café, LLC (5705). The corporate headquarters address of these Debtors is 1727 Riverside Drive, Cincinnati, OH 45202.

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Motion, in the Asset Purchase Agreement (as defined herein) entered into between the Debtors and Books Enterprise, LLC, the Memphis Purchase Agreement (as defined herein) entered into between the Debtors and DK Booksellers, LLC, or the Store Closing Agreement (as defined herein) entered into between the Debtors and Gordon Brothers Retail Partners, LLC, as the context dictates.

approved bidding procedures for the sale of the assets of the Debtors (the "Bid Procedures Order") [DE 452]; the Court having reviewed the Motion and all pleadings related thereto; the Court finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and (iii) proper and adequate notice of the Motion has been given and that no other or further notice is required under the facts and circumstances; and the Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors and their estates; and after due deliberation thereon; and good and sufficient cause appearing therefor:

**NOW, THEREFORE, THE COURT HEREBY FINDS THAT:**

Background

A.       Pursuant to the Bid Procedures Order, on April 20, 2011 the Debtors conducted an Auction (as defined in the Motion) to sell substantially all of their assets pursuant to Section 363 of the Bankruptcy Code. Upon the conclusion of the Auction, the Debtors filed a Notice Identifying the Successful Bidders In Accordance with the Bid Procedures Order (the "Auction Notice") [DE 478].   Pursuant to the Auction Notice,   Booksellers Enterprises, LLC ("Booksellers") was identified as the Prevailing Purchaser with respect to the Debtors assets and operations in Lexington, KY, Cincinnati, OH, Cleveland, OH and the central operations center in Cincinnati, OH (the "Booksellers Locations") and the names "Davis Kidd" and "Davis Kidd Booksellers" and related trade names and trademarks. The Debtors and Booksellers have agreed to the terms of an asset purchase agreement (the "Booksellers Purchase Agreement" and together with all documents related thereto, including a Transition Services Agreement as agreed to between the Debtors and Booksellers for the purposes of supporting the transition asset for the in

2

this Order, the "Booksellers Agreements") in order to document the terms and conditions of the sale of assets from the Debtors to Booksellers. A copy of the Booksellers Purchase Agreement is attached hereto as Exhibit A.

B.    Pursuant to the Auction Notice, Gordon Brothers Retail Partners, LLC ("GBRP") was identified as the Prevailing Purchaser with respect to the inventory at Fredricksburg, VA (the "Liquidating Location") and Memphis, TN. The Debtors and GBRP have agreed to the terms of an agency agreement (the "Store Closing Agreement") to document the terms and conditions related to the sale of inventory to GBRP and the conduct of the liquidation at the Liquidating Location (the "Store Closing Sale", and the assets liquidated pursuant thereto, the "Liquidation Assets"). A copy of the Store Closing Agreement is attached hereto as Exhibit B.

C.    Subsequent to the filing of the Auction Notice, GBRP, the Debtors, and DK Booksellers, LLC ("DK Booksellers") reached an agreement to allow the store in Memphis, TN (the "Memphis Store") to remain as an operating bookstore, with DK Booksellers purchasing the inventory from GBRP and certain other assets related to the Memphis Location from the Debtors. The Debtors subsequently filed a Second Notice Identifying the Successful Bidders In Accordance with the Bid Procedures Order (the "Second Auction Notice") [DE 490]. To document this transaction, the Debtors, GBRP, DK Booksellers, and Webster Business Credit Corporation, the lender under the Debtor in Possession Financing Agreement, entered into an Amendment No. 1 to the Agency Agreement (the "Amendment to Agency Agreement" and together with the Store Closing Agreement, the "Agency Agreement"). Further, the Debtors and DK Booksellers entered into a purchase agreement (the "Memphis Purchase Agreement" and together with the Amendment to the Agency Agreement, the "Memphis Agreement") to document the sale of certain other assets from the Debtors to DK Booksellers. A copy of the

Amendment to Agency Agreement is attached hereto as        Exhibit C; and a copy of the Memphis

Purchase Agreement is attached hereto as Exhibit D.

D.      For purposes of this Order, Booksellers and DK Book      sellers are referred to

together as the "Going Concern Buyers"; and Booksel      lers, DK Booksellers and GBRP are

referred to collectively as the "Buyers."  The Book      sellers Purchase Agreement, Booksellers

Agreements, Agency Agreement, Amendment to Agency A      greement, and Memphis Agreement

are referred to collectively as the "Transactions A      greements," and the transactions contemplated

thereby, the "Transaction."

E.      The assets purchased pursuant to the Booksellers Ag      reements are the

"Booksellers Assets."  The assets purchased pursuan      t to the Memphis Agreement are the

"Memphis Assets." The Booksellers Assets and Memph      is Assets are collectively referred to as

the "Assets", and the transfer of Assets, the "Sale      ").

F.      The findings and conclusions set forth herein const      itute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy       Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014. To th       e extent that any of the following findings

of fact constitute conclusions of law, they are ado      pted as such.  To the extent any of the

following conclusions of law constitute findings of      fact, they are adopted as such.

G.      The notice provided of the Motion and of the hearin      g to consider approval of the

Motion complied with all applicable provisions of B      ankruptcy Rules 2002, 6004, 6006 and 9014,

was adequate and sufficient under the circumstances      , and any otherwise applicable requirement

for notice is hereby waived and dispensed with.

4

H.      The Transactions Agreements were negotiated and ent        ered into in good faith, based upon arm's length bargaining, and without col       lusion or fraud, and both the entry into and consummation of the Transactions Agreements are in        the best interest of the Debtors' estates.

Findings of Fact Specific to the Buyers

I.      The Assets are property of the Debtor's chapter 11        bankruptcy estates, the Debtors are the sole and lawful owners of the Asset       s, and the Debtors are authorized to issue a bill of sale to the Buyers for the Assets and to se        ll the Assets free and clear of any and all liens, claims, encumbrances and interests, pursuant to sec       tion 363(f) of the Bankruptcy Code, with all such liens, claims, encumbrances and interests atta        ching to the net sale proceeds of the Assets to the extent applicable.

J.      The Sale to the Buyers of the Assets constitutes a        sale of property of the Debtors' chapter 11 bankruptcy estates outside the ordinary        course of business of the Debtors within the meaning of section 363(b) of the Bankruptcy Code.

## Good Faith Of Buyer

K.      The Buyers availed themselves of due diligence data        available to any prospective purchaser of the Debtors' assets and communicated w        ith representatives of and counsel for the Debtors and the Creditors' Committee in conjunction        with the auction of the Debtors' assets. No allegation has been made, nor any evidence offered,        that the Buyers acted improperly, unfairly or in collusion with any other party in regard to the        auction of the Debtors' assets, or that any agreement among potential bidders existed which wou        ld violate the provisions of section 363(n) of the Bankruptcy Code.  Accordingly, the Buyers ar        e each a "good faith" purchaser under section 363(m) of the Bankruptcy Code and, as such,        are entitled to all of the protections afforded thereby. The Buyers are not an "insider"        of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

L.      The Court previously entered interim and final orders authorizing Joseph-Beth Booksellers, LLC to incur post-petition secured indebtedness (the "DIP Loan Orders") [DE 70, DE 220], granting post-petition liens (the "DIP Liens") and authorizing the Debtors to use such collateral. The Debtors ability to use cash collateral terminates on or about April 30, 2011. Accordingly, the Transactions must be approved and consummated promptly in order to preserve the value of the Debtors' assets as a going concern.

**Competing Offers**

M.      The Debtors received six Qualifying Bids (as defined in the Motion), including bids submitted by GBRP, Booksellers and Joseph-Beth Group, LLC (n/k/a DK Booksellers, LLC) for the Purchased Assets.

N.      Pursuant to the Bid Procedures Order, an Auction was held on April 20, 2011 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors. The results of the Auction and subsequent agreements are set forth in the Auction Notice and Second Auction Notice and as further described at the Sale Hearing held on April 27, 2011.

**Approval Of the Motion**

O.      The terms of the Transactions with respect to the Buyers, as set forth in the Transaction Agreements, are fair and reasonable under the circumstances of this chapter 11 case and are hereby approved in all respects.

P.      The terms and conditions set forth in the Transaction Agreements and the transaction(s) contemplated thereby are fair, adequate and reasonable terms and conditions, including the amount of the purchase price, and constitute the highest and best offer obtainable by the Debtors for the Assets.

Q.      The consideration to be provided by the Buyers for the Assets pursuant to the Transaction Agreements: (i) is fair and reasonable; (ii) represents the highest and best offer for

6

the Assets; and (iii) constitutes reasonably equiva     lent value and fair consideration under the

Bankruptcy Code and under the laws of the United St     ates of America, any state, territory,

possession, and the District of Columbia where the     Assets may be located.

R.    The Debtors have full and all necessary power and a     uthority to execute and

deliver the Transaction Agreements and all other do     cuments contemplated thereby to the Buyers;

and, except as otherwise set forth herein and in th     e Transaction Agreements, no further consents

or approvals are required for the Debtors to consum     mate the transactions. Consummation of the

Transactions (as defined below) is not dependent up     on the consummation of any one of the

Transactions and the Debtors are authorized and dir     ected to consummate each of the

Transactions as promptly as possible.

S.    The Bid Procedures (as approved by the Bid Procedur     es Order) afforded a full,

fair and reasonable opportunity for any entity to m     ake a higher and better offer to purchase the

Assets. All potential bidders and parties-in-inter     est acted in full compliance with the provisions

of the Bid Procedures Order.  The consideration set     forth in the Transaction Agreements was

determined by the Debtors, in consultation with the     Creditors' Committee and the Lender, to be

the highest and best transactions for the Assets.

T.    The Motion and the Transaction Agreements should be     approved in their entirety

as they are in the best interests of the creditors     and are in the best interests of the Debtors'

chapter 11 bankruptcy estates.

U.    The Sale is not being entered into in order to esca     pe liability for the debts of the

Debtor's chapter 11 bankruptcy estate. The Debtor'     s chapter 11 bankruptcy estates are unable to

otherwise satisfy the Debtors' debts.

7

**Buyers are Not a Mere Continuation of the Debtor.**

V.    The Buyers are not a mere continuation of the Debtors or their chapter 11 bankruptcy estates and there is no continuity of enterprise between the Buyers and the Debtors or the chapter 11 bankruptcy estates of the Debtors.

W.    The Transactions are not being entered into fraudulently. As set forth herein, the Transactions have been properly noticed to all parties required or entitled to receive notice of the Sale.

X.    The Buyers represent that they are not holding itself out to the public or to any party as a continuation of the Debtors.

Y.    The Buyers are not, as a result of any action taken in connection with the purchase of the Assets or otherwise: (i) a successor to the Debtors; or (ii) has not, de facto or otherwise, merged or consolidated with or into any of the Debtors.

**No Successor Liability**

Z.    The Buyers do not constitute a successor of any the Debtors or of the chapter 11 bankruptcy estates of any of the Debtors or of any of the officers, directors, shareholders or equity holders of the Debtors or any Affiliates of the Debtors, although the Going Concern Buyers may elect to employ officers, directors, shareholders or equity holders in their sole discretion and certain of the officers, directors, shareholders or equity holders of the Debtors may have or acquire an equity interest in the Buyers.

AA.    The Transactions do not amount to a consolidation, merger or de facto merger of the Buyers and the Debtors or any of the Affiliates of the Debtors.

BB.    Booksellers Enterprise, LLC is a newly formed Kentucky limited liability company and is only buying the Booksellers Assets, and as such, Booksellers is not a

8

continuation of the Debtors or the Debtors' business operations. Bookseller is not acquiring any equity or membership interests in any of the Debtors.

CC.    DK Booksellers, LLC is a newly formed Ohio limited liability company and is only buying the Memphis Assets, as such, DK Booksellers is not a continuation of the Debtors or the Debtors' business operations. DK Booksellers is not acquiring any equity interests in any of the Debtors.

### Assumption and Assignment of the Assumed Contracts

DD.    The Debtors may assume the Assumed Contracts and assign each of them to the Going Concern Buyers pursuant to section 365 of the Bankruptcy Code free and clear of any and all Liens and Encumbrances (as defined below). A list of the Assumed Contracts being assigned to Bookseller is attached hereto as Exhibit E. A list of the Assumed Contracts being assigned to DK Booksellers is attached hereto as Exhibit F.

EE.    The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the Booksellers Agreement and Memphis Agreement, respectively, and is in the best interests of the Debtors and the Debtors' chapter 11 bankruptcy estates, the creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. Each of the Assumed Contracts is either an executory contract or an unexpired lease under section 365 of the Bankruptcy Code which is subject to assumption by the Debtors and assignment to the Going Concern Buyers. The assignment of the Assumed Contracts to the Going Concern Buyers pursuant to the Booksellers Agreements and the Memphis Agreement (i) are or will be legal, valid, and effective transfers of property or rights of or to the Assumed Contracts to the Going Concern Buyers; and (ii) vest or will vest the respective Going Concern Buyers with good and valid title, and all the right, title

and interest of the Debtors in and to the Assumed Contracts free and clear of all Liens and Encumbrances.

FF.    The respective amounts set forth on Exhibits E and F hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure any and all defaults and pay any and all actual pecuniary and non-pecuniary losses under the Assumed Contracts (the "Cure Amounts").

GG.    The Going Concern Buyers have provided adequate assurance of their future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

### Section 363 Sale

HH.    The Going Concern Buyers contend that they would not have entered into the Booksellers Agreements or Memphis Agreement, respectively, and would not consummate the transaction(s) contemplated thereby if the sale of the Assets to the Going Concern Buyers and the assumption, assignment and sale of the Assumed Contracts to the Going Concern Buyers, were not, except as otherwise specifically set forth herein and in the Booksellers Agreements and Memphis Agreement, free and clear of any and all Liens and Encumbrances of any kind or nature whatsoever, or if the Buyers would, except as otherwise specifically set forth herein and in the Booksellers Agreements and Memphis Agreement, or in the future could be liable for any of such Liens and Encumbrances or any other obligations and liabilities of the Debtors, including, but not limited to, Liens and Encumbrances or claims otherwise arising under doctrines of successor liability in respect of the following (the following being referred to collectively as the "Successor Liability Documents, Statutes and Claims"): (1) any employment or labor agreements; (2) all deeds of trust and security interests; (3) claims, causes of action or suits related to any intellectual property rights being sold to the Buyer; (4) any pension, welfare,

compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtors; (5) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtors or any predecessors; (6) environmental or other claims or Liens arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statute; (7) any bulk sales or similar law; (8) any tax statutes, ordinances or lien rights, including, without limitation, the Internal Revenue Code of 1986, as amended; and (9) any theories of successor liability. For clarity, nothing in this Order or in the Transaction Agreements releases, nullifies, precludes or enjoins the enforcement of any liability owing to any governmental unit under any police or regulatory statute or regulation that the Buyers would be subject to, under applicable law, for acts or omissions related to the ownership of the Assets and the operation of the business of the Buyers from and after the Closing.

II.    The provisions of section 363(f) of the Bankruptcy    Code have been satisfied in all respects. To the extent any entity claims an inter    est in the Assets and has not objected to the Motion, such entities are deemed to have consented    to the sale pursuant to section 363(b)(2) of the Bankruptcy Code.

JJ.    Except as otherwise specifically set forth herein a    nd in the Transaction Agreements, with respect to any and all entities as    serting any options, pledges, security interests, claims, equities, reservations, third party rights,    voting trusts or similar arrangements, Liens, DIP Liens, charges or other encumbrances or restriction    s or conditions to transfer or assignment of any kind (including, without limitation to the gene    rality of the foregoing, restrictions or conditions on or to the transfer, assignment or ren    ewal of licenses, permits registrations and authorizations or approvals of or with respect to g    overnmental units and instrumentalities), whether direct or indirect, absolute or contingent,    matured or unmatured, liquidated or unliquidated on or against the Assets (collectively    , the "Encumbrances"), either: (i) such entity has consented to the sale and transfer, license and    assignment, as applicable, of the Assets free and clear of its Lien and Encumbrance, with such Li    en and Encumbrance to attach to the proceeds of such sale and transfer, license and ass    ignment, as applicable, respectively; (ii) applicable nonbankruptcy law permits sale of the As    sets free and clear of such Lien and Encumbrance; (iii) such Lien and Encumbrance is in    bona fide dispute; or (iv) such entity could be compelled, in a legal or equitable proceeding, t    o accept a money satisfaction of such Lien and Encumbrance, so that the conditions of section 363(    f) of the Bankruptcy Code have been met with respect to the Transactions and the Bookseller    s Agreements and Memphis Agreement.

KK.    The Buyers are not purchasing all of the Debtors' a    ssets. None of the Buyers are purchasing any assets except as set forth in their    respective Transaction Agreements.

LL.    The Buyers are not assuming any of the Debtors' lia    bilities or Liens and Encumbrances except as set forth in the Transaction    Agreements, as applicable.

MM.    The attached Exhibit G sets forth the executory con    tracts and unexpired leases that are being rejected as of the Closing. All oth    er executory contracts and leases of the Debtors not explicitly listed on either Exhibits E, F, or E    xhibit G of this Order shall be assumed or rejected pursuant to subsequent orders of this Cour    t, upon proper application therefore.

NN.    Given all of the circumstances of this chapter 11 c    ase and the adequacy and fair value of the Purchase Price under the Transaction A    greements, the proposed sale of the Assets pursuant to the Transaction with the Buyers constit    utes a reasonable and sound exercise of the business judgment of the Debtors and should be appr    oved by this Court.

### Sale of Personally Identifiable Information

OO.    The Assets purchased by the Going Concern Buyers in    cludes personally identifiable information, including: name and addre    ss, e-mail address, and information about products purchased from the Debtors (the "Customer    Records").  Pursuant to section 363(b)(1)(A), and in accordance with the Bookseller    s Agreements and Memphis Agreement, the Buyers shall with respect to any personally identif    iable consumer information and subject to the requirements of any existing or future law or regul    ation establish an Email Privacy Policy substantially similar to, and in all material respe    cts consistent with the Debtors' Email Privacy Policy. The sale of such Customer Records based on    the Booksellers Agreements and Memphis Agreement is appropriate because: (a) the Buyers c    ontinue to operate the materially same type of business as the Debtors; (b) the Buyers intend t    o use the Customer Records for the same purposes as the Debtors and (c) the Buyers agree t    o comply with applicable nonbankruptcy law and to employ appropriate information security cont    rols and procedures to protect the personally identifiable information.

13

PP.    An Opt Out Process will be undertaken before the Closing to allow customers to opt out of the sale of the Customer Records. The opt out notices will be provided to customers via e-mail and notices will be placed on the Debtors' web site. The notices will be sent and/or posted no later than twenty-four (24) hours following entry of this Order and will require customers to opt out within forty-eight (48) hours of such time as the notices are sent and/or posted.

### Miscellaneous

QQ.    Any and all findings of fact and conclusions of law announced by this Court at the hearing to approve the Sale (the "Sale Hearing") are hereby incorporated herein.

<u>Findings of Fact Specific to GBRP</u>

RR.    The conduct of the Store Closing Sale at the Liquidating Location will provide an efficient means for the Debtors to dispose of the Liquidation Assets located at the Liquidating Location.

SS.    The Debtors have represented to this Court that they are neither selling nor leasing personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code ("<u>Personally Identifiable Information</u>") (or assets containing personally identifiable information) pursuant to the Motion to GBRP or pursuant to the Store Closing Agreement, although GBRP will be authorized to distribute promotional materials to the Debtors' customers through the Debtors' retained third party service provider.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    All objections to the Motion or the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to this Court at the Sale Hearing or by

stipulation filed with this Court, and all reservation of rights included in such objections, are hereby overruled in all respects on the merits and denied.

Conclusions of Law With Respect to the Going Concern Buyers and the Sale of the Assets

2.      All persons and entities are hereby forever prohibited and enjoined from taking any and all action against the Going Concern Buyers or the Assets that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Assets to the Going Concern Buyers in accordance with the terms of the Booksellers Agreements and the Memphis Agreement and this Order or otherwise interfere with the Buyers use of the Assets after the Closing.

3.      The sale of the Customer Records complies with the requirements of sections 363(b)(1) and is hereby authorized and approved. The Debtors are authorized to initiate the Opt Out process set forth above.

4.      Nothing in this Order or in the Booksellers Agreements and the Memphis Agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police or regulatory statutes or regulations that the Going Concern Buyers would be subject to as the owner of the Assets after the Closing.

5.      The Booksellers Agreements and the Memphis Agreement are hereby approved in all respects, and shall be deemed in full force and effect, binding and benefiting the Debtors, the Going Concern Buyers and any and all parties in interest in this chapter 11 case.

6.      The Debtors are authorized, empowered and directed to execute and deliver to the respective Going Concern Buyers the Booksellers Agreements and the Memphis Agreement and any and all other agreements contemplated thereby or reasonably requested by the Going Concern Buyers, and to implement and consummate all of the transactions and perform all

obligations contemplated by the Booksellers Agreeme nts and the Memphis Agreement, including, without limitation, to sell the Assets t o the Going Concern Buyers and to assume and assign to the Going Concern Buyers the Assumed Cont racts, all on the terms of the Booksellers Agreements and the Memphis Agreement and herein, fo r the Purchase Price set forth therein, and determined in accordance with, the Booksellers Agre ements and the Memphis Agreement and this Order. The Debtors are authorized, empowered and directed to operate their businesses in the ordinary course until the closing of the transa ctions authorized by this Order. The Debtors are authorized, empowered and hereby directed to delive r special warranty deeds, bills of sale, assignments and other such documentation that may b e necessary or requested by the Buyers in accordance with the terms of the Booksellers Agreem ents and the Memphis Agreement and this Order to evidence the transfers to the Going Concer n Buyers required by the Booksellers Agreements and the Memphis Agreement and this Order . The Debtors are authorized and directed to consummate each of the Transactions as promptly as possible, without regard to the consummation of any of the other Transactions appro ved herein and upon performance by each such party, it shall not be entitled to the full be nefits and protections of this Order, irrespective of, and whether or not, any other party performs un der their respective Agreements.

7.       Upon the Closing, the Going Concern Buyers shall ta ke title to and possession of the respective Assets. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of title to the Assets and the Assumed Contracts shall be, exce pt as otherwise specifically set forth herein and in the Booksellers Agreements and the Memphis A greement, free and clear of any and all Liens and Encumbrances, including, without limitati on, any claims pursuant to any successor or successor-in-interest liability theory.  All Liens and Encumbrances shall attach solely to the proceeds of the Sale with the same validity and pri ority as they attached to the Assets.

16

8.      The Going Concern Buyers are not a mere continuatio       n of the Debtors nor do the Buyers constitute a successor to the Debtors or the       current or former equity holders of the Debtors. Except as otherwise set forth herein and i       n the Booksellers Agreements and the Memphis Agreement, the Going Concern Buyers are not       expressly or impliedly agreeing to assume any of the Debtors' liabilities, Liens and E       ncumbrances. The transactions contemplated by the Booksellers Agreements and the Memphis Agree       ment do not amount to a consolidation, merger or a de facto merger of any of the Debtors a       nd either of the Going Concern Buyers, the Going Concern Buyers are not merely a continuation       of the Debtors, and the transactions contemplated by the Booksellers Agreements and the       Memphis Agreement are not being entered into fraudulently or in order to escape liability f       rom the Debtors' debts or their creditors.

9.      This Order shall be binding in all respects upon th       e Debtors, their estates, all creditors of, and holders of equity interests in, t       he Debtors (whether known or unknown), any holders of Liens and Encumbrances on the Assets, al       l governmental units with claims against the Debtors, the Attorney Generals of the various State       s where the Assets are located or where the Debtors conducted their business operations, all no       n-Debtor parties to the Assumed Contracts, all successors and assigns of the Going Concern Buyers,       the Debtors and their affiliates and subsidiaries, the Assets and any trustees, if any,       subsequently appointed upon a conversion of one or more of these chapter 11 cases to chapter 7       under the Bankruptcy Code. This Order and the Booksellers Agreements and the Memphis Agreemen       t shall inure to the benefit of the Debtors, their estates, their creditors, the Going       Concern Buyers and their respective successors and assigns.

10.     Any and all persons and entities are forever prohib       ited and enjoined from commencing or continuing in any manner any action o       r other proceeding, whether in law or

equity, in any judicial, administrative, arbitral o      r other proceeding against the Buyers, its

successors and assigns, or the Assets, with respect      to: (a) any Liens and Encumbrance arising

under, out of, in connection with or in any way rel      ating to the Debtors, the Going Concern

Buyers, the Assets, the operation of the Assets pri      or to the Closing of the sale of the Assets; or

(b) any successor liability, including, without lim      itation, the following actions:

(i)    Commencing or continuing in any manner any action o      r other proceeding

against the Going Concern Buyers, its successors or      the Assets;

(ii)    Enforcing, attaching, collecting or recovering in a    ny manner any

judgment, award, decree or order against the Going      Concern Buyers, its successors or the Assets;

(iii)    Creating, perfecting or enforcing any Lien or other      Encumbrance against

the Buyer, its successors or the Assets;

(iv)    Asserting any setoff, right of subrogation or recou      pment of any kind

against any obligation due the Going Concern Buyers      or its successors or the Assets;

(v)    Commencing or continuing any action, in any manner      or place, that does

not comply or is inconsistent with the provisions o      f this Order or other orders of this Court, or

the agreements or actions contemplated or taken in      respect thereof; or

(vi)    Revoking, terminating or failing or refusing to ren      ew any license, permit

or authorization to operate any of the Assets or co      nduct any of the businesses operated with the

Assets.

11.    Without limiting the generality of the foregoing, e      xcept as otherwise specifically

set forth herein and in the Booksellers Agreements      and the Memphis Agreement, the Going

Concern Buyers shall not assume or be obligated to      pay, perform or otherwise discharge any

workers' compensation debts, obligations, liabiliti      es, judgments or consents of the Debtors

18

arising pursuant to state law or otherwise. This Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination or other incidents, acts or injuries prior to the Closing, including, but not limited to, any and all workers' compensation claims filed or to be filed, or reopenings of those claims, by or on behalf of any of the Debtors' current or former officers, employees, persons on laid-off, inactive or retired status, or their respective dependents, heirs or assigns, a swell as any and all premiums, assessments or other obligations of any nature whatsoever of the Debtors relating in any way to workers' compensation liability.

12.    In addition, without limiting the generality of the foregoing, except as otherwise specifically set forth therein and in the Bookseller s Agreements and the Memphis Agreement, the Going Concern Buyers shall not assume or be obligated to pay, perform or otherwise discharge any debts, obligations and liabilities of the Debtors arising pursuant to the Debtors' ownership or operation of their businesses or business operation sprior to the date of the Closing, including but not limited to, any successor liabilities in respec tof the Successor Liability Documents, Statutes and Claims or otherwise.

13.    All entities that are in possession of some or all of the Assets on the Closing are directed to surrender possession of such Assets to the appropriate Going Concern Buyer at the Closing.

14.    The Going Concern Buyers shall not have any liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets.  Without limiting the generality of the foregoing, the Going Concern Buyers shall not be liable for any

Liens, Encumbrances and/or claims against the Debtors or any of their predecessors or affiliates or any of the current or former officers, directors or equity holders of the Debtors and their Affiliates, and the Going Concern Buyers shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the applicable Closing, now existing or hereafter arising, whether fixed or contingent, with respect to any of the Debtors or any and all obligations of the Debtors arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing. The Going Concern Buyers have given substantial consideration under the Booksellers Agreements and the Memphis Agreement for the benefit of the holders of Liens, Encumbrances and all parties in interest. The consideration given by the Buyers shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Going Concern Buyers, which releases shall be deemed to have been given in favor of the Buyers by all holders of Liens and Encumbrances against the Debtors and/or the Assets.

15.    Upon the Closing of the Transactions and the payment of the applicable Cure Amounts, if any, the Debtors are authorized and directed to assume and assign each Assumed Contract to the respective Going Concern Buyers free and clear of any and all Liens and Encumbrances. Such payments (if any) shall: (a) effect a cure of all defaults existing thereunder as of the Closing Date; (b) compensate for any actual pecuniary and non-pecuniary loss to such non-Debtor party resulting from such default; and (c) together with the assumption of the Assumed Contracts by the Going Concern Buyers, constitute adequate assurance of future

performance thereof. The Going Concern Buyers shall then have assumed the Assumed Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Contracts shall not be a default thereunder. After the payment of the relevant Cure Amounts, neither the Debtors nor the Going Concern Buyers shall have any further liabilities to the non-Debtor parties to the Assumed Contracts other than the Going Concern Buyers' obligations under the Assumed Contracts that first become due and payable on or after the Closing for periods from and after the Closing and which do not relate to the period prior to the Closing.

16.     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Going Concern Buyers of the Assumed Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Going Concern Buyers shall be fully and irrevocably vested with all rights, title and interest of the Debtors under the applicable Assumed Contract notwithstanding any provision in any of the Assumed Contracts or any applicable law (including, without limitation, provisions of the type described in sections 365(b)(2), (c)(1), and (f)(1) of the Bankruptcy Code) that prohibits, restricts, or conditions in any way such assignment or transfer including, but not limited to, change of control restrictions, radius restrictions, relocation provisions, payment, or liabilities triggered by the sale and/or assignment of the Assumed Contracts, or any portion thereof. Any

21

provisions of any lease of real property constituti ng an Assumed Contract that purports to permit the landlords thereunder to cancel the remaining te rm of such lease if the Debtors discontinue its use or operation of the leased real property is voi d and of no force and effect, and shall not be enforceable against the Going Concern Buyers and an y sublessees thereof, and the landlord under such lease shall not have the right to cancel or otherwise modify such lease or increase the rent, assert any claim or impose any penalty by rea son of such discontinuation, the Debtors' cessation of operations, the assignment of such lea se to the Buyers or its assignee or the interruption of business activities at any of the l eased premises.

17.    Upon the Closing and the payment of the relevant Cu re Amounts, the Going Concern Buyers shall be deemed to be substituted fo r the Debtors as a party to the applicable Assumed Contracts and the Debtors shall be relieved from all liability on such Assumed Contracts arising after the Closing.

18.    Upon the payment of the applicable Cure Amount, if any, and subject to the terms of the stipulation of the parties to any Assumed Co ntract filed with the Court, if any: (a) each Assumed Contract shall constitute a valid and exist ing interest in the property subject to such Assumed Contract; (b) none of the Debtors' rights w ill have been released or waived under any such Assumed Contracts; (c) the Assumed Contracts s hall remain in full force and effect; and (d) no default shall exist under the Assumed Contra cts, nor shall there exist any event or condition which, with the passage of time or the gi ving of notice, or both, would constitute such a default.

19.    The Going Concern Buyers have provided adequate ass urance of its future performance under the relevant Assumed Contracts wi thin the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)( B) of the Bankruptcy Code.

20.    There shall be no rent accelerations, assignment fe    es, increases (including advertising rates) or any other fees charged to Goi    ng Concern Buyer as a result of the assumption and assignment of the Assumed Contracts.

21.    Pursuant to sections 105(a), 363 and 365 of the Ban    kruptcy Code, all parties to the Assumed Contracts are forever barred and enjoin    ed from raising or asserting against the Going Concern Buyer any assignment fee, default, br    each or claim or pecuniary loss, or condition to assignment, arising under or related t    o the Assumed Contracts existing as of the Closing or arising by reason of the Closing.

22.    The Going Concern Buyers are good faith purchasers    within the meaning of section 363(m) of the Bankruptcy Code of the Assets    and Assumed Contracts and, as such, are entitled to the full protections of section 363(m)    of the Bankruptcy Code with respect to the Sale.

23.    Pursuant to Rules 7062, 9014, 6004(h) and 6006(d) o    f the Federal Rules of Bankruptcy Procedure, this Order shall be effective    immediately upon entry and the Debtors are authorized to close the Transactions immediately up    on entry of this Order.

24.    A Certified Copy of this Order may be filed with th    e appropriate Clerk and/or recorded with the Recorder to act to cancel the Lie    ns and other Encumbrances of record.

25.    If any person or entity which has filed statements    or other documents or agreements evidencing Liens and/or Encumbrances on,    or interests in, the Assets shall not have delivered to the Debtors prior to the Closing, in p    roper form for filing and executed by the appropriate parties, termination statements, instru    ments of satisfaction, releases of liens and easements, and any other documents necessary for th    e purpose of documenting the release of all Liens and Encumbrances which the person or entity h    as or may assert with respect to the Assets, the Debtors are hereby authorized and directed, and    the Going Concern Buyers are hereby

authorized, to execute and file such statements, in        struments, releases and other documents on behalf of such person or entity with respect to the        Assets.

26.     The automatic stay provisions of section 362 of the        Bankruptcy Code are vacated and modified to the extent necessary to implement t        he terms and conditions of the Booksellers Agreements and the Memphis Agreement and the provis        ions of this Order.

27.     This Order is and shall be binding upon and govern        the acts of all entities, including, without limitation, all filing agents, f        iling officers, title agents, title companies, recorders of mortgages, recorders of deeds, registr        ars of deeds, administrative agencies, governmental departments, taxing authorities, secre        taries of state, federal and local officials, and all other persons and entities who may be required        by operation of law, the duties of their office, or contract, to accept, file, register or otherwise        record or release any documents or instruments, or who may be required to report or insure any titl        e or state of title in or to any lease; and each of the foregoing persons and entities is hereby direct        ed to accept for filing any and all of the documents and instruments necessary and appropriate        to consummate the transactions contemplated by the Booksellers Agreements and the        Memphis Agreement, and each of whom is further directed to accept this Order as sole and s        ufficient evidence of the transfer of title of such Assumed Contracts to the Going Concern Buyers and s        uch agency, department, or instrumentality may rely upon this Order in consumm        ating the transactions contemplated herein. All Liens and Encumbrances, including without limit        ation, any mechanic's liens, personal property tax liens, mortgages, deeds of trust, secu        rity agreements and security interests against the Debtors and/or the Debtors' estates of record a        s of the date of this Order shall forthwith, upon the occurrence of the Closing, be removed and stric        ken as against the Assets, including without limitation, the Assumed Contracts, without further        order of this Court or act of any other court or

24

party, and all parties are forever barred, estopped, and permanently enjoined from asserting any such liens, claims, and/or encumbrances against Assignee or its successors or assigns.

28.    This Order constitutes authorization under all applicable jurisdictions' versions of the Uniform Commercial Code for the Going Concern Buyer to file UCC termination statements with respect to all security interests in or liens on the Assets.

29.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

30.    The failure specifically to include any particular provision of the Booksellers Agreements and the Memphis Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Booksellers Agreements and the Memphis Agreement be authorized and approved in its entirety, including any modifications, amendments or supplements permitted by this Order.

31.    The Booksellers Agreements and the Memphis Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on any of the Debtors' chapter 11 bankruptcy estate.

32.    This Court shall retain jurisdiction over the transactions contemplated in the Booksellers Agreements and the Memphis Agreement and this Order for purposes of enforcing the provisions of this Order and the Booksellers Agreements and the Memphis Agreement. To the extent that any provisions of this Order shall be inconsistent with the Motion, the terms of this Order shall control. To the extent that any provisions of the Booksellers Agreements and the

Memphis Agreement may be inconsistent with the term    s of this Order, the Asset Purchase

Agreement shall control.

33.    The terms of this Order shall be incorporated into    any plan proposed in this

chapter 11 bankruptcy case, and this Order and the    Booksellers Agreements and the Memphis

Agreement shall not be modified in any manner in an    y plan proposed to or approved by this

Court. The terms of this Order shall survive the a    ppointment of a trustee, the conversion of this

case to a chapter 7 case, or the dismissal of this    case.

Conclusions of Law with Respect to the Agency Agree    ment and Agreements with GBRP

34.    The relief requested in the Motion is    **GRANTED,** the Store Closing Sale at the

Liquidating Location is    **APPROVED** and entry into the Agency Agreement (as defined below)

is **APPROVED**.

### Approval of the Agreements

35.    The Store Closing Agreement and the Amendment to Ag    ency Agreement

(together, for purposes of this section, the "Agenc    y Agreement") and all other ancillary

documents, and all of the terms and conditions ther    eof and each of the transactions contemplated

thereby, are hereby authorized and approved. No ot    her or further consents or approvals of this

Court are required for the Debtors to consummate or    effectuate the terms of the Agreements.

36.    Pursuant to § 363(b) of the Bankruptcy Code, the De    btors are authorized,

empowered and directed to take any and all actions    necessary or appropriate, to: (a) consummate

the transactions contemplated by the Agency Agreeme    nt; (b) execute and deliver, perform under,

consummate, and fully implement the Agency Agreemen    t, including making all payments

required by the Agency Agreement as and when due th    ereunder without further order of this

Court, and transferring all assets as contemplated    by the Memphis Agreement.

26

37.    The Debtors, GBRP, and DK Booksellers, and each of        their respective officers, employees and agents be, and they hereby are, autho        rized to execute such documents and to do such acts as are necessary or desirable to effectua        te the Agreements and the related actions set forth therein, and to carry out the Store Closing S        ales.

38.    The terms and provisions of this Order shall be bin        ding in all respects upon GBRP and the Debtors, their estates and any trustees the        reof, and all creditors and shareholders of the Debtors, all interested parties and their respectiv        e successors and assigns, including, but not limited to, any creditor asserting a Lien, claim or        other interest in the assets which are the subject of the Store Closing Agreement.

### Sale and Transfer of Debtors' Assets

39.    Pursuant to §§ 105(a) and 363 of the Bankruptcy Cod        e, the Debtors, and each of their respective officers, employees and agents may        conduct the Store Closing Sales and are entitled in so doing to all of the protections affo        rded thereby.

40.    Pursuant to § 105(a) and 363 of the Bankruptcy Code        , the Debtors, and each of their respective officers, employees and agents are        authorized to enter into the Agency Agreement and to carry out all provisions as requir        ed therein.

41.    The Sale Guidelines are hereby approved and shall b        e deemed the "Sale Guidelines".

42.    The Debtors, in consultation with GBRP and the Cred        itors' Committee, and Debtors' landlords at the Liquidating Location are        authorized to enter into agreements between themselves modifying the Sale Guidelines without fu        rther order of the Court. Any such agreements shall be binding on the Debtors, GBRP an        d each such landlord. No such agreements shall affect the rights of any Governmental Unit.

43. The Store Closing Sale shall not be exempt from, an        d the Debtors shall be required to comply with, all laws of general applic        ability, including without limitation, public health and safety laws, and applicable criminal, tr        affic, tax, labor, employment, environmental, and consumer protection laws, including consumer la        ws regulating deceptive practices and false advertising (collectively, "General Laws   "). Subject to the foregoing, the Debtors and GBRP        are hereby authorized to take such actions necessary an        d appropriate to implement the Agency Agreement and to conduct the Store Closing Sale at        the Liquidating Location without the necessity of a further order of this Court, includi        ng, but not limited to, advertising the Store Closing Sale through the posting of signs (includin        g the use of exterior banners at (i) non-enclosed mall stores, and (ii) enclosed mall stores        to the extent the applicable store entrance does not require entry into the enclosed mall common are        a), use of sign walkers and street signage, in accordance with the Agency Agreement and as otherwi        se provided in the Sale Guidelines.

44. Except as otherwise provided in the Agency Agreemen        t, pursuant to section 363(f) of the Bankruptcy Code, Liquidation        Assets sold during the Store Closing Sale or pursuant to the Agency Agreement shall be sold free        and clear of any and all mortgages, security interests, conditions sales or title retention agre        ements, pledges, hypothecations, liens, judgments, interests, encumbrances or claims of any        kind or nature (including, without limitation, any and all "claims" as defined in sect        ion 101(5) of the Bankruptcy Code), including, without limitation, the liens and security interest        asserted by Webster Business Credit Corporation and Ingram Booksellers, Inc., whether a        rising by agreement, any statute or otherwise and whether arising before, on or after t        he date on which these chapter 11 cases were commenced (collectively, the "Liens"), with such Li        ens, if any, to attach to the Net Proceeds, and any other amounts payable to Joseph-Beth Bookse        llers, LLC under the Agency Agreement

28

with the same validity, and effect as the same had          with respect to the Merchandise at issue, subject to any and all defenses, claims and/or coun          terclaims or set offs that may exist.

45.      To the extent the Debtors are conducting the Store          Closing Sale in violation of any provision of any of the Debtors' leases, all of          the Debtors' landlords are directed to accept this Order as binding authority authorizing the Deb          tors and GBRP to conduct the Store Closing Sale in accordance with the Agency Agreement, the S          ale Guidelines, and this Order.

46.      If any parties or persons, including, but not limit          ed to, landlords, subtenants, utility companies, creditors and all those acting f          or or on their behalf, believe that cause exists to          : (a) prohibit the Debtors from advertising the Store          Closing Sale, to the extent the same is consistent with the Agency Agreement or Sale Guidel          ines, (b) in any way interfere with or otherwise impede the conduct of the Store Closing S          ale at the Liquidating Location or the use or maintenance of the Debtors' assets located at the L          iquidating Location or Distribution Centers, or (c) institute any action or proceeding in any co          urt or other administrative body having as its objective the obtaining of an order or judgment aga          inst the Debtors, GBRP or a landlord that might in any way directly or indirectly obstruct or          otherwise interfere with or adversely affect the conduct of the Store Closing Sale and/or seek to re          cover damages for breach(es) of covenants or provisions in any lease or sublease based upon any          relief authorized herein, this Court shall retain exclusive jurisdiction to resolve such dispu          te, and such parties or persons shall take no action against the Debtors, GBRP, or the landlord r          elated to the Store Closing Sale until this Court has resolved such dispute. This Court shall          hear the request of such person or parties with respect to such disputes on an expedited basis, as          may be appropriate under the circumstances.

47.      The Store Closing Sale at the Liquidating Location          shall be conducted by the Debtors notwithstanding any restrictive provision o          f any lease, sublease or other agreement

relative to occupancy affecting or purporting to restrict the conduct of the Store Closing Sale, the abandonment of assets or "going dark" provisions; provided, however, that nothing in this Order shall impact any objection a landlord may have to assumption, assignment or rejection of their respective lease or to any proposed cure amount or rejection damages claim in association with such assumption, assignment or rejection. The Debtors shall have no right to occupancy of any leased space after the rejection of the related lease.

48.    No bulk sale or similar laws shall prohibit the Debtors or GBRP from taking action contemplated by the Agency Agreement.

49.    Except as to Governmental Units (as to which this paragraph shall not apply), and except as expressly provided for herein or in the Sale Guidelines: no person or entity, (i) served with a copy of the Motions; or (ii) served with a copy of this Order who does not object pursuant to the provisions of this Order, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closing Sale, or the advertising and promotion (including the posting of signs and use of sign walkers) of such Store Closing Sale, and all such parties and persons of every nature and description, including landlords and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, or otherwise impeding the conduct of the Store Closing Sale and/or (b) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtors, GBRP, or the landlords, that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closing Sale and/or seek to recover damages for breach(es) of covenants or provisions in any lease or sublease based upon any relief authorized herein. All newspapers and other advertising media in which the Sale may be advertised are directed to accept this Order as

binding authority so as to authorize the Debtors an    d GBRP to consummate the Store Closing

Agreement and to conduct the Sale at the Liquidatin    g Locations (including without limitation

placing advertisements of the Sale at the contractu    al rates charged to the Debtors) in accordance

with the Agency Agreement, the Sale Guidelines and    this Order; and no further advertising-

related approvals, licenses or permits shall be req    uired.

50.    The Debtors shall have the right to use the Liquida    ting Location and all related

store services, furniture, fixtures, equipment and    other assets at the Liquidating Location for the

purpose of conducting the Sale, free of any interfe    rence from any entity or person. GBRP is

further granted a limited license and right to use,    until the Sale Termination Date, the trade

names, email lists, customer lists, and logos relat    ing to and used in connection with the operation

of the Liquidating Location, solely for the purpose    of advertising and conducting the Sale in

accordance with the terms of the Agency Agreement.    Upon expiration of the limited license

granted by this paragraph, the trade names, email l    ists, customer lists and logos relating to the

Liquidating Location shall revert to the Debtors, o    r, as applicable, to any Buyer which may have

purchased such assets.

51.    Provided that the Store Closing Sale is conducted i    n accordance with the terms of

this Order, the Agency Agreement, and the Sale Guid    elines, and in light of the provisions in the

laws of many Governmental Units that exempt court-o    rdered sales from their provisions, the

Debtors, their landlords, and GBRP are authorized t    o proceed with and to conduct the Store

Closing Sale in accordance with the terms of this O    rder, the Agency Agreement, and the Sale

Guidelines, without further showing of compliance w    ith any GOB Law (as defined below). For

purposes of this Order, a "GOB Law" shall mean any    federal, state or local statute or ordinance,

lease provision or licensing requirement directed s    olely at regulating store closing, "going out of

business," liquidation, bankruptcy or auction sales ("GOB Sales"), such as laws restricting safe, professional and non-deceptive, customary advertising of GOB Sales such as signs, banners, postage of signage, and use of sign walkers, and including ordinances establishing licensing or permitting requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to GOB Sales (collectively, the "GOB Laws").

52.    The Debtors and/or GBRP's use, in conformity with the Sale Guidelines, the Agency Agreement and the Order, of (i) sign walkers; (ii) interior store signage and banners; and (iii) exterior banners and signage ("Banner and Sign Walker Advertising"), is authorized (subject to the terms and conditions of any side letter agreement between the Debtors and a landlord entered into in connection with the Store Closing Sale), notwithstanding any restrictive provision of any lease, sublease or other agreement affecting or purporting to restrict such activity so long as such activity is undertaken in a safe, professional and non-deceptive manner. Any person who, after having received a copy of this Order, and after having been specifically advised in writing of the provisions of this paragraph, continues to interfere with Banner and Sign Walker Advertising undertaken in compliance with this Order, shall be liable to GBRP and/or the Debtors and affected landlord(s) for any and all damages resulting from such continued interference.

53.    Nothing in this Order shall be deemed to bar any Governmental Units from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or GBRP's right to assert that any such laws are not in fact General Laws or independently that such enforcement is impermissible under the Bankruptcy Code, this Order or otherwise. Each applicable Governmental Unit shall provide the Debtors and GBRP and any affected landlord with reasonable notice and opportunity to cure any alleged violation of any applicable law or

32

regulation prior to instituting formal administrati    ve or judicial proceedings unless the protection
of public safety or health precludes such notice an      d opportunity to cure. No party waives any
rights to argue any position with respect to whethe        r the conduct was in compliance with this
Order and/or any applicable law, and/or that enforc       ement of any such law is preempted by the
Bankruptcy Code. In the event that the Debtors and        GBRP are unable to have such
Governmental Unit withdraw any citations that may b      e issued by a Governmental Unit against a
landlord, then, to the extent that the applicable l      ease, common law or statute provides for such an
indemnity, the Debtors shall, jointly and severally      , indemnify, defend and hold harmless such
landlord from any and all penalties, costs and expe       nses, including attorneys fees, incurred in
connection with such citation.

54.    The Debtors shall serve copies of this Order within        five (5) business days, by
first-class mail, upon (i) the state Attorney Gener       al's offices (upon (x) Chief or Director of the
Consumer Protection Division or Bureau; and (y) Chi       ef or Director of the Bankruptcy Division
or Bureau) and state Consumer Protection Agency for       each state where a Liquidating Location is
located, and (ii) the local mayor or similar repres      entative of each village, or city official, and the
county or parish where a Liquidating Location is lo      cated, addressed to the attention of the
municipal, city or county attorney, in each case to      the consumer protection division.

55.    If there is a dispute as to whether the general con       duct of the Store Closing Sales in
accordance with this Order, the Agency Agreement an      d the Sale Guidelines would violate any
law (including without limitation a GOB Law) and sh       ould be limited or barred (a "Reserved
Dispute") resolution of such Reserved Dispute will       take place before this Court, as provided in
this paragraph. Any time before the fifteen (15th)       day following the service of this Order as
provided for above, any Governmental Unit may asser       t a Reserved Dispute by sending a notice

explaining the nature of the dispute to counsel to the Debtors, GBRP and the Creditors' Committee. If the Debtors and the objecting Governmental Unit, (as the case may be, the "Objecting Party") are unable to resolve the Reserved Dispute within fifteen (15) days of receipt of the Objecting Parties' notice, either party may file a motion with the Court requesting a resolution of the dispute ("Dispute Resolution Motion"). Any issues relating to a Reserved Dispute shall not affect the finality of this Order or limit or interfere with the conduct of the Store Closing Sales prior to any ruling by this Court on such Reserved Dispute.

56.    If such a Dispute Resolution Motion is timely filed, the Debtors and GBRP shall each be entitled to assert that the provisions in question are preempted by the Bankruptcy Code and/or that neither the terms of this Order nor the conduct of the Store Closing Sale violates the GOB Law. By timely filing a Dispute Resolution Motion, all Governmental Units shall be entitled to assert any jurisdictional, procedural or substantive argument that it might heretofore have been entitled to raise. Any such Dispute Resolution Motion will also be served upon any affected landlord

57.    Nothing herein shall be deemed to constitute a ruling on any issue that might be raised in a Dispute Resolution Motion, including whether any non-bankruptcy state law, regulation or rule applicable to the Store Closing Sales is preempted by the Bankruptcy Code nor as to whether the automatic stay applies nor is this Order a ruling with respect to whether sovereign immunity applies. Notwithstanding anything to the contrary herein, to the extent that disputes arise during the course of the Store Closing Sales with respect to laws regulating the use of Banner and Sign Walker Advertising and the Debtors and/or GBRP are unable to resolve the matter consensually with the Governmental Unit, either party may request an immediate telephonic hearing with this Court and, subject to the Court's calendar and to the extent

34

practicable, such hearing shall be scheduled initially within two (2) business days of the request (which shall not preclude the scheduling of additional hearings for the presentment of evidence or argument, as may be necessary).

58.    All state and federal laws relating to implied warrants for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales." During the Sale Term, the Debtors shall accept return of any goods that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within the same period proscribed by the Debtors' return policy that was in effect when the merchandise was purchased (except with respect to items purchased during the Store Closing Sales, in which case such items must be returned within fourteen (14) days following the purchase date), the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect. The Debtors' employees and GBRP's personnel shall be made aware of this policy and consumers shall be so informed of the policy.

59.    Gift cards and merchandise credits issued by the Debtors prior to the Sale Commencement Date shall be accepted and honored by the Debtors at the Liquidating Location.

60.    Returns of Merchandise purchased prior to the Sale Commencement Date will be accepted at the Liquidating Locations in accordance with the return policy of the Debtors in effect when such Merchandise was purchased.

61.    Before any sale or abandonment of computers (including software) and/or cash registers and any other point of sale owned FF&E (collectively, the "POS Equipment"), which may contain personally identifiable information, the Debtors shall remove or cause to be removed the personally identifiable information and any proprietary information or data which

may be used by any competitors of Booksellers or DK        Booksellers from the POS Equipment
(and GBRP shall have no responsibility therefore).

62.    Pursuant to Section 364(a) of the Bankruptcy Code,        any amounts owed by the
Debtors to GBRP under the Agency Agreement shall be        entitled to superpriority status.

63.    This Order constitutes an authorization of conduct        by the Debtors and nothing
contained herein shall be deemed to constitute a ru        ling with regard to the sovereign immunity of
any state, and the failure of any state to object t        o the entry of this Order shall not operate as a
waiver with respect thereto.

64.    Notwithstanding Bankruptcy Rules 6003, 6004 and 600        6, sufficient cause,
including a showing of irreparable and immediate ha        rm to the Debtors, exists such that this
Order shall be effective and enforceable immediatel        y upon entry and its provisions shall be self-
executing. In the absence of any person or entity        obtaining a stay of this Order pending appeal,
the Debtors, GBRP, and DK Booksellers are free to p        erform under the Agency Agreement at any
time, subject to the terms of the Agency Agreement,        and to enter into the Amendment to the
Agency Agreement and Memphis Agreement and to carry        out the terms thereof.

65.    Immediately upon entry of this Order, the terms and        provisions of this Order shall
become valid and binding and inure upon the benefit        of GBRP, DK Booksellers, and the
Debtors, all prepetition and post-petition secured        and unsecured lenders and creditors and all
parties-in-interest, and the Debtors' respective es        tates or either of them, including the Creditors'
Committee or any of Debtors' affiliates and their r        espective successors and permitted assigns,
including any trustee or other fiduciary hereafter        appointed or elected as a legal representative of
the Debtors or either of them or their estates or e        ither of them under chapter 7 or chapter 11 of
the Bankruptcy Code.

66.    The provisions of this Order and the Agency Agreement and any actions taken pursuant thereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan or plans of reorganization of the Debtors (including a plan or plans of liquidation), dismissing the case, or converting the Debtors' cases from chapter 11 to chapter 7 of the Bankruptcy Code, and the terms and provisions of the Agency Agreement as well as the rights and interests granted pursuant to this Order and the Agency Agreement shall continue in this or any superseding case and shall be binding upon the Debtors, all creditors (whether known or unknown) of the Debtors, GBRP, including the Debtors' respective estates or either of them, including the Creditors' Committee or any of Debtor's affiliates and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed or elected as a legal representative of the Debtors or either of them or their estates or either of them under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee elected or appointed in these cases shall be and hereby is authorized and directed to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and GBRP and the trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment or election of a trustee without the need for further order of this Court.

67.    The Debtors shall otherwise leave the Liquidating Location in broom clean condition upon the conclusion of GOB Sales at the Liquidating Locations. To the extent that the applicable lease, common law or statute, provides for such an indemnity, the Debtors shall, jointly and severally, indemnify, defend and hold harmless the landlord at the Liquidating Locations from any and all liabilities, fees and/or costs incurred by such landlord as a result of

claims by parties with liens on any property, inclu        ding but not limited to FF&E or Merchandise, left or abandoned at the Liquidating Locations prem        ises at the end of the Sale Term.

68.    Except for Assets sold pursuant to the sales to the        Going Concern Buyers, The Debtors are authorized to include in the Sale at th        e Liquidating Location additional merchandise that is currently located at other remaining stores        and is not selling in a timely manner.

69.    GBRP further is authorized and empowered (in GBRP's        sole discretion and at GBRP's sole cost and expense) to supplement the Mer        chandise in the Store with additional goods, of like kind and quality, as is customarily        sold in the Store (the "Additional Goods        "), provided however that the Additional Goods will not exceed more tha        n two hundred seventy-five thousand dollars ($275,000) at GBRP's cost. Sales        of Additional Goods shall be run through Merchant's cash register systems, provided, however        , that GBRP shall mark the Additional Goods using either a "dummy" SKU or department numb        er or in such other manner so that GBRP and the Debtors are able to distinguish the sa        le of Additional Goods from the sale of Merchandise. In the event that GBRP elects to incl        ude Additional Goods in the Sale, GBRP shall provide signage in the Stores providing custo        mers of reasonable notice that Additional Goods have been included in the Sale. The Debtors        and GBRP agree that the transactions relating to the Additional Goods are, and shall be        construed as, a true consignment from GBRP to the Debtors in all respects and not a consignmen        t for security purposes. At all times and for all purposes, the Additional Goods and their procee        ds shall be the exclusive property of GBRP, and no other person or entity (including, without l        imitation, the Debtors or Lenders) shall have any claim against any of the Additional Goods or th        eir proceeds. The Additional Goods shall at all times remain subject to the exclusive control o        f GBRP. The Debtors and GBRP shall reconcile the proceeds from the sale of Additional        Goods as part of the Weekly Sale

Reconciliation process. The Additional Goods automatically shall be deemed to be consigned goods of GBRP for all purposes, including under Article 9 of the Commercial Code, with GBRP's interests in the Additional Goods to be as consignor and the Debtors' interests in the Additional Goods to be as consignee, and GBRP shall not be required to make any filings or serve any notices to perfect its status as consignor of the Additional Goods (provided that GBRP may, but shall have no obligation, to make any such filings and serve any such notices).

70.     The FF&E remaining in the Liquidating Locations after the rejection date of the lease for the Liquidating Locations shall, unless the affected landlord has been previously notified in writing by the Debtors to the contrary at least seven (7) days prior to the rejection date, be deemed abandoned by the Debtors to the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors; provided however, the Debtors shall provide any known third party holding or asserting a Lien or other interest in such FF&E, including taxing authorities, with seven (7) days' prior notice of such abandonment and if such third party fails to remove such FF&E or to make arrangements to remove such FF&E within such time as is deemed acceptable to the affected landlord prior to the expiration of such seven (7) day period, such FF&E shall be deemed abandoned by such third party and the affected landlord may dispose of such property without liability to them or to any third party. At the conclusion of the Sale Term, GBRP may abandon in place any unused owned FF&E.

71.     GBRP shall not be liable for any claims against Debtors other than as expressly provided for in the Agency Agreement.

72.     GBRP is a party-in-interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to the Agency Agreement and the conduct of the Sale.

39

73.    The failure specifically to include any particular    provisions of the Agency Agreement or in this this Order shall not diminish or im    pair the effectiveness of such provisions, it being the intent of the Court that the Agency Agree    ment and Store Closing Sale be authorized and approved in their entirety.

74.    To the extent, if any, anything contained in this O    rder conflicts with a provision in the Agency Agreement or the Sale Guidelines, this O    rder shall govern and control.

75.    Notwithstanding Bankruptcy Rules 6004 and 6006, thi    s Order shall be effective and enforceable immediately upon entry and its prov    isions shall be self-executing.  In the absence of any person or entity obtaining a stay pe    nding appeal, the Debtors, GBRP, and DK Booksellers, Inc. are free to perform under the Agr    eements at any time, subject to the terms thereof, and up on performance by each such party, i    t shall be entitled to the full benefits

76.    Except as otherwise expressly provided herein, the    Court shall retain exclusive jurisdiction over the parties to enforce this Order    and the relief provided for herein, the Store Agreements, the Sale Guidelines, Agency Agreement,    all amendments or modifications to any of the foregoing, any waivers and consents thereunder,    and of each of the agreements executed in connection therewith in all respects, and to determ    ine disputes thereunder, and protect GBRP and the Buyer against any Liens or interference with th    e Store Closing Sale, or to resolve any disputes relating to the Store Closing Sale or the    Agency Agreement or the implementation thereof.

77.    To the extent that this Order is inconsistent with    any prior order or pleading with respect to the Motions in these chapter 11 cas    es, the terms of this Order shall govern. The provisions of this Order are non-severable and mutu    ally dependent.

78.    This Court shall retain jurisdiction over the terms    of this Order.

Use of Proceeds

79.     Upon receipt of the proceeds received by the Debtor        s upon the closing of the

Transactions (the "Sale Proceeds"), such funds shal        l be used first to establish an escrow account

to fund administrative and wind-down expenses in th        e amount of $205,000, assuming that the

Company has fully drawn on the DIP line to $4,500,0        00 and $78,000 is set aside as additional

funding of operating/winddown expenses (If the line        is not fully drawn, the escrow will be

adjusted upward accordingly) (the "Administrative E        scrow Fund") to be utilized in accordance

with the terms of paragraph 8 of that certain Settl        ement Agreement dated as of April 25, 2011

between Ingram Book Group Inc. ("Ingram") and the C        ommittee (the "Ingram Settlement

Agreement"), second, to fund an escrow to fund paym        ents required under Permitted Liens (as

defined in the Debtor in Possession Financing Agree        ment) in the amount of $150,000 (the

"Permitted Liens Fund") and thereafter shall be pai        d to Webster Business Credit Corporation

("WBCC"), the Lender under the Debtors' Debtor-in-P        ossession Financing Agreement. Except

as set forth in the Agency Agreement, including wit        hout limitation, Sections 3.3(b), 8.8, 8.10 and

16 of the Store Closing Agreement, all proceeds pai        d to WBCC are irrevocably paid and shall

not be subject to disgorgement or refund in whole o        r in part under any circumstances. The DIP

Facility maintained by WBCC shall be terminated as        of the Closing of the Transactions. WBCC,

as DIP Lender, shall be released from any and all c        laims thereunder by the Debtors and their

estates upon such termination. Notwithstanding the        termination of the DIP Facility, all cash

receipts of the Debtor received after Closing shall        be credited against the amounts payable by

Ingram under paragraph 8 of the Ingram Settlement a        nd credited against the Administrative

Escrow Fund. All funds remaining in the Administra        tive Escrow Fund and in the Permitted

Liens Fund after final satisfaction of the debts an    d liabilities for which such funds have been

established shall be paid to Ingram.

      80.     The Booksellers Purchase Agreement contains an esc    row amount of $200,000

(the "Escrow") to fund adjustments required due to    the any difference between the Estimated

Closing Inventory Value and the Closing Inventory V    alue (the "Inventory Adjustment"), as set

forth in Section 2.6 (b) the Booksellers Purchase A    greement. The Escrow shall be the sole

moneys available in the event of an Inventory Adjus    tment, and the Debtors, WBCC nor any

other party shall be responsible for any further ob    ligations with respect to the Inventory

Adjustment.

**Tendered by:**

**DINSMORE & SHOHL LLP**

*/s/ Ellen Arvin Kennedy, Esq.*
Ellen Arvin Kennedy, Esq. (KY #88347)
Lexington Financial Center
250 West Main Street, Suite 1400
Lexington, KY 40507
Telephone: (859) 425-1000
Facsimile: (859) 425-1099
ellen.kennedy@dinslaw.com

Kim Martin Lewis (OH #0043533)
Patrick D. Burns (OH #00081111)
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Telephone: (513) 977-8200
Facsimile: (513) 977-8141
kim.lewis@dinslaw.com
patrick.burns@dinslaw.com
**COUNSEL FOR DEBTORS AND
DEBTORS-IN-POSSESSION**

HAVE SEEN AND AGREED:

*/s/ Adam R. Kegley, Esq. per email authority*
Adam R. Kegley, Esq.
Frost Brown Todd LLC
250 West Main Street, Suite 2800
Lexington, KY 40507
Telephone: (859) 231-0000
Facsimile: (859) 231-0011
akegley@fbtlaw.com
**CO-COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

*/s/ Gregory R. Schaaf, Esq. per email authority*
Gregory R. Schaaf, Esq.
Greenebaum Doll & McDonald PLLC
300 West Vine Street, Suite 1100
Lexington KY 40507
Telephone: (859) 288-4629
grs@gdm.com
**COUNSEL FOR WEBSTER BUSINESS CREDIT CORPORATION**

*/s/ Thomas R. Allen, Esq. per email authority*
Thomas R. Allen, Esq.
Allen Kuehnle Stovall & Neuman LLP
17 S. High Street, Suite 1220
Columbus, OH 43215
Telephone: (614) 221-8500
Facsimile: (614) 221-5988
allen@aksnlaw.com
**COUNSEL FOR INGRAM BOOK GROUP INC.**

*/s/ Dean A. Langdon, Esq. per email authority*
Dean A. Langdon, Esq.
DelCotto Law Group PLLC
200 North Upper Street
Lexington, KY 40507
Telephone: (859) 231-5800
Facsimile: (859) 281-1179
dlangdon@dlgfirm.com
**COUNSEL FOR BOOKSELLERS ENTERPRISES, LLC**

_/s/  GregoryD.Pavey,Esq.peremailauthority_
GregoryD.PaveyEsq.
StollKeenonOgdenPLLC
300WestVineStreet,Suite2100
LexingtonKY40507-1801
Telephone:(859)231-3911
Facsimile:(859)253-1093
gregory.pavey@skofirm.com
**COUNSELFORGORDONBROTHERSRETAILPARTNERS,LLC**


_/s/DonaldJ.Rafferty,Esq.peremailauthority_
DonaldJ.Rafferty,Esq.
DonaldW.Mallory,Esq.,
Cohen,Todd,Kite&Stanford,LLC
250E.FifthStreet,Suite1200
Cincinnati,Ohio45202
Telephone:(513)421-4020
Facsimile:(513)241-4490
drafferty@ctks.com
dmallory@ctks.com
**COUNSELFORDKBOOKSELLERS,LLC**

PursuanttoLocalRule9022-1(c),EllenArvinKenne        dy
shallcauseacopyofthisordertobeservedonea          ch
ofthepartiesdesignatedtoreceivethisorderpur        suant
toLocalRule9022-1(a)andshallfilewiththecou          rta
certificateofserviceoftheorderuponsuchparti        es
withinfourteen(14)dayshereof.

CopiesservedontheMasterServiceListandtothe        followingviaovernightmail:

OfficeoftheAttorneyGeneral
Attn:ConsumerProtection
900EastMainStreet
Richmond,VA23219

CityofFredericksburgMayor'sOffice
Attn:ConsumerProtection
715PrincessAnneStreet
Fredericksburg,VA22401-5916

44

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document*
*has been signed by the Judge and electronically entered by the Clerk in the*
*official record of this case.*



**Signed By:**
_**Tracey N. Wise**_
**Bankruptcy Judge**
**Dated: Thursday, April 28, 2011**
**(tnw)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **JB BOOKSELLERS, INC., a Kentucky corporation, et al.** | Case No. 10-53593 (tnw) |
| Debtors[1] | Jointly Administered |

# EXHIBIT A

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: JB Booksellers, Inc. (5130); Joseph-Beth Booksellers, LLC (6343); and Joseph-Beth Café, LLC (5705). The corporate headquarters address of these Debtors is 1727 Riverside Drive, Cincinnati, OH 45202.

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of April 26, 2011, by and between Joseph-Beth Booksellers, LLC, a Tennessee limited liability company, Joseph-Beth Café, LLC, a Tennessee limited liability company, and JB Booksellers, Inc., a Kentucky corporation, and their affiliated debtors and debtors in possession in Bankruptcy Case No. 10-53593 (jointly administered), currently pending in the bankruptcy court for Eastern District of Kentucky (collectively, the "Seller"), and Booksellers Enterprises, LLC, a Kentucky limited liability company (the "Buyer"). Seller and Buyer are sometimes individually referred to as a "Party" and together as the "Parties."

### RECITALS

WHEREAS, Seller is a retailer of books, music and other sideline items and operator of cafés (the "Business");

WHEREAS, Seller filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Kentucky, Lexington Division (the "Bankruptcy Court", and the proceeding administered thereunder, the "Chapter 11 Case");

WHEREAS, Buyer and Seller have determined that it is in their respective best interests for Seller to sell, convey, assign, transfer and deliver to Buyer, and for Buyer to purchase and receive from Seller, the assets used in Seller's Business, as set forth herein and on the terms and conditions contained in this Agreement;

WHEREAS, the Parties desire to consummate the transactions contemplated by this Agreement as promptly as practicable after the satisfaction or waiver of all other conditions set forth herein; and

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1    Definitions. As used herein, the following terms have the meanings set forth below:

(a)    "Accounts Receivable"

receivables in favor of Seller as of the Closing Date and all claims arising in connection

means the outstanding accounts receivable, notes receivable, notes and other receivables in favor of Seller as of the Closing Date and all claims arising in connection therewith.

(b)    "Affiliate" means, with respect to any specified Person, any Person that (directly or indirectly through one or more intermediaries) controls, is controlled by, or is under common control with, the specified Person (including such Person's subsidiaries).

(c)    "Alternative Transaction" means the sale of any material portion of the Purchased Assets to a Person other than Buyer or an Affiliate of Buyer, whether effectuated through a sale of assets, a sale of equity securities or any similar transaction.

(d)    "Assumed Contract" means any Contract that is designated by Buyer as an Assumed Contract by written notice to Seller prior to the Closing.

(e)    "Agreement" has the meaning set forth in the first paragraph of this Agreement.

(f)    "Assignment Order" has the meaning set forth in Section 2.4.

(g)    "Assumed Liabilities" has the meaning set forth in Section 2.3.

(h)    "Auction" means the auction of all of the Sellers' assets in accordance with the terms as set forth in the Bid Procedures Order.

(i)    "Back-Up Bidder" has the meaning set forth in Section 8.2(b).

(j)    "Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

(k)    "Bankruptcy Court" has the meaning set forth in the Recitals.

(l)    "Base Amount" has the meaning set forth in Section 2.6.

(m)    "Bid Procedures Order" means the Order of the Bankruptcy Court entered on March 23, 2011 [ECF No. 452] and attached hereto as Exhibit A.

(n)    "Bill of Sale" means the Bill of Sale, Assignment and Assumption Agreement in form and substance mutually agreeable to Buyer and Seller.

(o)    "Books and Records" means the books and records of Seller in physical, electronic or other format, including without limitation, (i) all merchandise, analysis reports, marketing reports and creative material, (ii) all records relating to customers, suppliers or personnel of Seller, (iii) all records relating to all business and marketing plans of Seller, (iv) all books, ledgers, files, reports, plans, and operating records of every kind of Seller and (v) all

1894628_1

2

software necessary or appropriate to access and utilize the information contained in the Books and Records.

(p)    "Business" has the meaning set forth in the Recitals.

(q)    "Business Day" shall mean any day other than any Saturday, Sunday or legal holiday in Lexington, Kentucky.

(r)    "Buyer" has the meaning set forth in the first paragraph of this Agreement.

(s)    "Buyer Locations" means the following retail store(s), café(s) service center(s) and other operations of Seller:

(i) retail store, café and all other operations at Lexington Green in Lexington, Kentucky (which premises is leased pursuant to that certain Lease Agreement, by and between Joseph-Beth Booksellers, Inc. and Lexington Green Development Company, Ltd., dated as of February 2, 1989, as amended May 13, 1992, June 26, 1995 and August 4, 1995; and assigned to Joseph-Beth Booksellers, LLC as of November 6, 1997; and Sublease Agreement by and between Joseph-Beth Booksellers, LLC and Joseph-Beth Café, LLC, dated as of August 31, 1998);

(ii) retail store, café and all other operations at Rockwood Pavilion in Cincinnati, Ohio (which premises is leased pursuant to that certain Lease Agreement by and between Rockwood Pavilion Limited Partnership and Joseph –Beth Booksellers, Inc., dated as of April 19, 1993, as amended on August 16, 1993, September 26, 1994 and August 21, 2003; and assigned to Joseph-Beth Booksellers, LLC as of November 10, 1997; together with any Café sublease);

(iii) retail store and all other operations at the Cleveland Clinic in Cleveland, Ohio (which premises is leased pursuant to that certain Lease Agreement by and between Joseph-Beth Booksellers, LLC and The Cleveland Clinic Foundation, dated as of November 18, 2009); and

(iv) service center in Cincinnati, Ohio (which premises is leased pursuant to that certain Service Center Lease by and between Joseph-Beth Booksellers, Inc. and The Sawyer Place Company, dated as of October 1, 1997, as assigned to Joseph-Beth Booksellers, LLC on November 2, 1997 and amended on June 6, 2002 and May 12, 2003, and amended in 2011 so that the lease is on a month-to-month basis).

(t)    "Buyer Governmental Approvals" has the meaning set forth in Section 4.4.

(u)    "Chapter 11 Case" has the meaning set forth in the Recitals.

(v)    "Closing" has the meaning set forth in Section 2.9.

(w)    "Closing Date" has the meaning set forth in Section 2.9.

(x)    "Closing Inventory Value" has the meaning set forth in Section 5.10.

(y)    "Closing Reduction Amount" has the meaning set forth in Section 2.6.

(z)    "COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state law.

(aa)    "Confidentiality Agreement" has the meaning set forth in Section 5.7.

(bb)    "Contracts" means the Leases and any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which Seller is a party and which Seller is permitted under the Bankruptcy Code to assume and assign.

(cc)    "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor, or otherwise.

(dd)    "Creditors Committee" means the Official Committee of Unsecured Creditors as appointed in the Chapter 11 Case by the United States Trustee on November 19, 2010.

(ee)    "Cure Cost" means the amount necessary to cure any default under any Contract pursuant to Section 365 of the Bankruptcy Code and to allow such Contract to be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(ff)    "DIP Lender" means Webster Business Credit Corporation.

(gg)    "Cure Notice" has the meaning set forth in Section 7.1(c).

(hh)    "DIP Financing" means all obligations owed by Seller to the DIP Lender, pursuant to the DIP Financing Agreement.

(ii)    "DIP Financing Agreement" means that certain Debtor-in-Possession Financing Agreement between Seller and the DIP Lender, dated as of November 15, 2010, as approved on a Final Basis by the Bankruptcy Court on December 10, 2010.

4

(jj)    "Employee Benefit Plan" means each employee benefit plan (as such term is defined in Section 3(3) of ERISA) and each other benefit plan, program or arrangement maintained, sponsored, contributed or required to be contributed to or for the benefit of any employee, officer, director, or contractor of Seller or any ERISA Affiliate of Seller.

(kk)    "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, and similar provisions having the force or effect of law, all judicial and administrative orders and determinations, and all common law, in each case concerning public or occupational health and safety, pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Material (including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act and analogous state laws), each as amended or in effect prior to, on or after Closing.

(ll)    "Equipment" means the equipment of Seller, including, without limitation, the equipment set forth on Schedule 1.1(ii) hereto, other than any Excluded Assets.

(mm)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(nn)    "ERISA Affiliate" means any Person that is treated as a single employer with Seller for purposes of Section 414 of the IRC.

(oo)    "Escrow Account" means the escrow account maintained under the Escrow Agreement.

(pp)    "Escrow Agent" means the escrow agent under the Escrow Agreement, which agent must be reasonably acceptable to Seller and Buyer.

(qq)    "Escrow Agreement" means an agreement in form and substance reasonably satisfactory to Buyer, Seller and the Escrow Agent wherein the funds are held to satisfy Seller's post-Closing obligations to Buyer under Section 2.6(b).

(rr)    "Estimated Closing Inventory Value" has the meaning set forth in Section 2.6(b).

(ss)    "Excluded Assets" has the meaning set forth in Section 2.2.

(tt)    "Excluded Contract" means any Contract other than an Assumed Contract.

(uu)    "Financial Statements" has the meaning set forth in Section 3.6.

5

(vv)    "Fixtures" means all trade fixtures and furnishings located at the Leased Real Property included in the Purchased Assets.

(ww)    "GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

(xx)    "Gift Card Liability" means an obligation to recognize the aggregate amount of liability resulting from loyalty coupons, gift certificates, gift cards and similar customer programs to the extent sold by the Seller or otherwise available to customers, as a credit against the price of merchandise sold by Buyer.

(yy)    "Governmental Authority" means any court, tribunal, bureau, board department, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

(zz)    "Hazardous Material" means (i) petroleum and petroleum products, radioactive materials, asbestos-containing materials, mold, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls, and radon gas, (ii) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law, and (iii) any other chemical, material or substance which is regulated by any Environmental Law.

(aaa)    "Intellectual Property" means all of the following used and/or related to the Business, regardless of whether such are owned by Seller: (i) trademarks, service marks, trade dress, logos, slogans, designs, trade names, and Internet domain names, applications, registrations, and renewals in connection therewith, and all goodwill associated with any of the foregoing, including, without limitation, the trade names "Joseph-Beth", "Joseph-Beth Booksellers", "Davis-Kidd" and "Davis-Kidd Booksellers" and all other names or trade names historically used by Seller, and all marks related to such trade names, (ii) inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements thereto, and patents, patent applications, and patent disclosures, together with reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (iii) copyrights and works of authorship, and applications, registrations, and renewals in connection therewith, (iv) trade secrets and confidential business information (including ideas, research and development, know-how, and customer and supplier lists), (v) computer software (including source code, executable code, data, databases, and related documentation), (vi) other proprietary and intellectual property rights, and (vii) copies and tangible embodiments of any of the foregoing (in whatever form or medium).

(bbb)    "Inventory" means all inventory of Seller of any kind or nature, whether or not prepaid, and wherever located.

6

(ccc)   "IRC" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the IRC are to the IRC as in effect on the date of this Agreement and any subsequent amendments or supplements thereto or substitutions therefor.

(ddd)   "Knowledge" means the actual knowledge, after reasonable investigation and due diligence inquiry into the relevant matter.

(eee)   "Latest Balance Sheet" has the meaning set forth in Section 3.6.

(fff)   "Leased Real Property" means all of Seller's leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property.

(ggg)   "Leases" means all leases, subleases, licenses, concessions and other agreements pursuant to which Seller holds an interest in Leased Real Property.

(hhh)   "Lien" means any lien (statutory or otherwise), hypothecation, encumbrance, claim, liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), or order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee or continuation of Seller or the Business, and (iv) any leasehold interest, license or other right, in favor of a third party or a Seller, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

(iii)   "Material Adverse Effect" means any change, effect, event, occurrence, loss, development, circumstance or state of facts occurs which has had or would reasonably be expected to have a materially adverse effect (i) on the Purchased Assets, taken as a whole, or (ii) on the business, properties, prospects (financial or otherwise), operations, financial condition or results of operations of Seller, taken as a whole, that (in the case of either clauses (i) or (ii)):

(A) prohibits or makes impractical the continued operation of any of the Buyer Locations from and after Closing materially consistent with historical operations at such Buyer Locations prior to the date of this Agreement; or

(B) results from misconduct by Sellers or its agents..

(jjj)   "Material Contracts" has the meaning set forth in Section 3.14.

7

(kkk)  "Necessary Consent" has the meaning set forth in Section 2.4.

(lll)   "Party" has the meaning set forth in paragraph 1.

(mmm)      "Parties" has the meaning set forth in paragraph 1.

(nnn)  "Permits" means all licenses (but not, for the sake of clarity, intellectual property licenses), permits (including environmental and occupancy permits), certificates, registrations, approvals, franchises, consents and other authorizations of Seller obtained from or filed with a Governmental Authority and used in connection with the Business.

(ooo)  "Permitted Liens" means (i) statutory liens for Taxes, assessments or other governmental charges not yet due and payable, (ii) liens which are expressly assumed or consented to by Buyer herein (including, without limitation, liens included in the Assumed Liabilities), and (iii) liens which are created by Buyer.

(ppp)  "Person"   means any natural person, corporation, limited liability company, general partnership, limited partnership, sole proprietorship, trust, union, association, Governmental Authority or other business organization.

(qqq)  "Physical Inventory" has the meaning set forth in Section 5.10.

(rrr)   "Prevailing Bidder" means the party submitting the highest or best bid at the Auction, as identified by the Sellers, in consultation with their advisors, the Creditors' Committee and the DIP Lender.

(sss)  "Purchased Assets" means all of the following assets, properties, rights, titles and interests of every kind and nature owned, leased or licensed by Seller or its affiliated debtors and debtors in possession in the Chapter 11 Case: (i) Books and Records related to or used in the operation of the Business at any of the Buyer Locations, (ii) Assumed Contracts and all of the rights and benefits accruing thereunder, including any outstanding deposits thereunder, (iii) Equipment located at or used in the operation of the Business at any of the Buyer Locations, (iv) Fixtures located at the Buyer Locations as of the date hereof, (v) Inventory located at the Buyer Locations as of Closing, (vi) Intellectual Property related to or used in the operation of the Business at any of the Buyer Locations, and the trade names "Davis Kidd" and "Davis-Kidd Booksellers" and related trade names and trademarks, (vii) transferable Permits used in the operation of the Business at any of the Buyer Locations, (viii) Security Deposits related to or used in the operation of the Business at any of the Buyer Locations, (ix) Supplies located at the Buyer Locations, (x) Accounts Receivable generated by operation of the Business at the Buyer Locations, (xi) advertising, marketing and promotional materials and all other printed or written materials related to or used in the operation of the Business at any of the Buyer Locations, (xii) goodwill as a going concern and all other intangible properties related to or used in the operation of the Buyer Locations, (xiii) telephone and facsimile numbers for the Buyer Locations, (xiv) insurance policies covering the Buyer Locations and the unearned premiums and proceeds thereof, (xv) other tangible and intangible assets located at or used in the operation of the Buyer Locations, (xvi) customer data and information, in print, electronic and  any other format, related

8

to or used in or derived from the operation of the Business at the Buyer Locations, (xvii) all transferable rights the Seller may have in the Cleveland Legacy Liquor License identified on Schedule 1.1(sss), including the benefit of the Security Deposit related to the Cleveland Legacy Liquor License, and (xviii) claims and causes of action Seller may have against third parties directly related to any of the foregoing items; in each case excluding any assets that are expressly identified as Excluded Assets.

(ttt)   "Purchase Price" has the meaning set forth in Section 2.6.

(uuu)   "Rehired Employee" has the meaning set forth in Section 5.2(a).

(vvv)   "Related Agreements" means the Bill of Sale and any other agreement, certificate or similar document executed pursuant to or in connection with this Agreement.

(www) "Related Person" means, with respect to a specific Person, any officer, director, member, manager, employee, agent, shareholder, representative, successor or assign of such Person.

(xxx)   "Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, or placing into or upon any land, building, surface, subsurface or water or air or otherwise entering into the environment.

(yyy)   "Retained Liabilities" has the meaning set forth in Section 2.3.

(zzz)   "Sale Hearing" means the hearing conducted by the Bankruptcy Court respecting entry of the proposed Sale Order.

(aaaa)   "Sale Order" means an Order of the Bankruptcy Court in form and substance mutually agreeable to Buyer and Seller.

(bbbb) "Security Deposits" means the deposits, advances, credits and security deposits made by or held by Seller in respect of the Purchased Assets and/or the Business, including, without limitation, those listed on Schedule 1.1(sss) hereto, but only to the extent any such deposits, advances, credits and security deposits are transferable.

(cccc)   "Seller" has the meaning set forth in the first paragraph of this Agreement.

(dddd) "Seller Governmental Approvals" has the meaning set forth in Section 3.3.

(eeee)   "Supplies" means all office supplies, other miscellaneous supplies, and other tangible property of any kind of Seller, wherever located, which are/is used in the Business.

(ffff)   "Taxes" means any and all taxes, fees, levies, duties, tariffs, import charges and other charges imposed by any taxing authority, together with any related interest, penalties or other additions thereto, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income, alternative or add-on

9

minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profit, environmental, custom, duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

(gggg) "Third Party Vendor" has the meaning set forth in Section 5.10.

(hhhh) "Transition Services Agreement" has the meaning set forth in Section 5.12.

1.2    Rules of Interpretation.

(a)    The singular includes the plural and the plural includes the singular.

(b)    The word "or" is not exclusive.

(c)    A reference to a Person includes its successors and permitted assigns.

(d)    The words "include," "includes" and "including" are not limiting.

(e)    A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes and Appendices to any document shall be deemed incorporated by reference in such document.

(f)    References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(h)    References to "days" shall mean calendar days, unless the term "Business Days" shall be used.

(i)    This Agreement is the result of negotiations among, and has been reviewed by, the Parties. Accordingly, this Agreement shall be deemed to be the product of both Parties, and no ambiguity shall be construed in favor of or against either Party.

10

ARTICLE 2
PURCHASE AND SALE OF ASSETS

2.1     Sale of Purchased Assets to Buyer.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, transfer, deliver and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller pursuant to Section 363 and 365 of the Bankruptcy Code, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, except Permitted Liens.

2.2     Excluded Assets.  Notwithstanding Section 2.1, the Parties acknowledge that Seller shall not sell, assign, transfer or convey to Buyer, and Buyer shall not purchase, acquire or accept from Seller, any of the following assets (all such assets, the "Excluded Assets"):

(a)     all assets, properties and rights of Seller listed on Schedule 2.2(a) hereto or that are tangible property located at or that relate solely to facilities of Seller that are not Buyer Locations;

(b)     all Excluded Contracts, which includes, without limitation, (i) any Leases for facilities of Seller that are not Buyer Locations or (ii) any Contracts that do not relate to any of the Buyer Locations or are not used in connection with the operation of the Business at any of the Buyer Locations;

~~(c)  Intellectual Property related solely to or used solely in the operation of the Business of Seller in Memphis, Tennessee (except for the trade names "Davis Kidd" and "Davis Kidd Booksellers" and related trade names and trademarks, all of which are Purchased Assets).~~

(c)     ~~(d)~~ all corporate seals, corporate organizational records, minute books, charter documents, corporate record books, and stock transfer books pertaining to Seller;

(d)     ~~(e)~~ all causes of action of Seller under Chapter 5 of the Bankruptcy Code, including but not limited to those related to any preferences or fraudulent conveyances, but excluding any such causes of action related to Buyer (which shall be included in the Purchased Assets);

(e)     ~~(f)~~ all causes of action of Seller against third parties that are not directly related to a Purchased Asset or Purchased Assets; and

(f)     ~~(g)~~ all cash and cash equivalents and all bank accounts, except to the extent they may constitute Accounts Receivable or Security Deposits included within the Purchased Assets.

2.3     Liabilities.

(a)     Upon the terms and subject to the conditions contained in this Agreement, at the Closing, as between Buyer and Seller, Buyer shall assume or otherwise be responsible only for (i) liabilities and obligations under the Assumed Contracts accruing or arising after the

11

Closing (other than any liability arising out of a breach of any such Contract prior to the Closing), and (ii) the Gift Card Liability to the extent presented or redeemed in accordance with its terms for merchandise at the Buyer Locations, other than, with respect to clauses (i) and (ii), liabilities or obligations arising as a result of any action or conduct of Seller or any of its Affiliates to the extent constituting misconduct by Seller or its agents or they arise outside the ordinary course of business (collectively, the "Assumed Liabilities").

(b)    It is expressly understood and agreed that, except for the Assumed Liabilities, Buyer shall not assume or be liable for any liability, obligation, debt, claim against, or Contract of, the Business, Seller or any of its Affiliates at any time existing or asserted, whether or not accrued, fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Seller or any of its Affiliates (the "Retained Liabilities"), which Retained Liabilities include, without limitation, the following:

(i)    all Taxes of Seller, including, without limitation, (x) any Taxes imposed on or with respect to the Purchased Assets for (A) all periods ending prior to the Closing and (B) the portion up to the Closing of any taxable period beginning prior to and ending after the Closing, (y) any sales Taxes arising from operation of the Business or Purchased Assets prior to Closing, and (z) any employee withholding or payroll Taxes arising from operation of the Business or Purchased Assets prior to Closing, except for any sales, use, value added, transfer, stamp and similar taxes applicable to the transactions contemplated by this Agreement;

(ii)    all liabilities and obligations arising out of or in connection with the Excluded Assets;

(iii)    all actions, suits, arbitration proceedings, grievances, complaints, charges, proceedings, orders, investigations or claims against Seller, the Business or the Purchased Assets;

(iv)    any and all liabilities and obligations under the Assumed Contracts that relate to or accrued during periods prior to the Closing; and

(v) notwithstanding any other provision contained in this Agreement, any and all liabilities and obligations of Seller with respect to any indebtedness for borrowed money regardless of when incurred or arising, and any and all liabilities of Seller for and relating to any guaranties, regardless of when incurred or arising, of any indebtedness for borrowed money of any Person.

2.4    Assignment Order.  With respect to any Purchased Assets which by their respective terms are not assignable without the consent of a third party, prior to the Closing, Seller shall file a motion with the Bankruptcy Court requesting that the Bankruptcy Court enter an order, in form and substance acceptable to the Buyer, pursuant to Section 365 of the Bankruptcy Code, providing that all such Purchased Assets shall be assumed by Seller and assigned to Buyer without the necessity of obtaining such consent (an "Assignment Order").  Such Assignment Order shall be incorporated into and deemed part and parcel of the Sale Order and must be entered by the Court along with the

12

Sale Order. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof and (b) the Bankruptcy Court shall not have entered an Assignment Order providing that such Necessary Consent is not required or such Assignment Order is not effective under law to cause the assignment absent receiving such Necessary Consent. In such event, Seller shall use its commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset. In order, however, to provide Buyer the full realization and value of the Purchased Assets, Seller agrees that on and after the Closing, it will, at the request and under the direction of Buyer, in the name of Seller or otherwise as Buyer shall specify, use commercially reasonable efforts (a) to assure that the rights of Seller under any such Purchased Assets shall be preserved for the benefit of Buyer and (b) to facilitate receipt of the consideration to be received by Seller in and under every such Purchased Asset, which consideration shall be held for the benefit of, and shall be delivered promptly to, Buyer. Nothing in this Section 2.4 shall in any way diminish or enlarge (x) Seller's obligations hereunder to use commercially reasonable efforts to obtain consents and approvals, and to take all such other actions specified herein prior to or at Closing as are necessary to enable Seller to convey and assign good and valid title to all the Purchased Assets to Buyer or (y) the Parties' obligations hereunder to obtain the Necessary Consents.

2.5    Property Held in Trust. Any funds or property received by Buyer after the Closing with respect to any Excluded Asset or with respect to the operation of the Business prior to the Closing shall be held by Buyer in trust for Seller until promptly delivered or paid to Seller. Likewise, any funds or property received by Seller after the Closing with respect to any Purchased Asset or with respect to the operation of the Business after the Closing shall be held by Seller in trust for Buyer until promptly delivered or paid to Buyer.

2.6    Purchase Price.

(a)    Subject to reduction as provided in Section 2.6 (b) and (c) below, the aggregate purchase price for the Purchased Assets shall be Two Million Six Hundred Forty-Four Thousand Dollars ($2,644,000) (the "Purchase Price"). The Purchase Price shall, subject to the terms of this Agreement and satisfaction or waiver of all conditions to Closing contained herein, be paid at Closing in the following manner:

(i)    $200,000 shall be paid by Buyer into the Escrow Account (to be held to satisfy Seller's post-Closing obligations under Section 2.6(b)) by wire transfer of immediately available funds pursuant to wire instructions provided by the Escrow Agreement;

(ii)    the balance of the Purchase Price, as adjusted by this Agreement, shall be paid by Buyer to Seller in immediately available funds pursuant to wire instructions provided by Seller to Buyer prior to the Closing.

13

(b)    The Purchase Price shall be reduced by 33 ½% of the amount by which the Closing Inventory Value (determined pursuant to Section 5.10) is less than $4,974,704 (the "Base Amount"). On the day before Closing, Buyer and Seller shall estimate, based on the records of Seller, the Closing Inventory Value as of Closing (the "Estimated Closing Inventory Value") and shall reduce the Purchase Price to be paid at Closing by 33 ½% of the amount by which the Estimated Closing Inventory Value is less than the Base Amount (the "Closing Reduction Amount"), if any (by way of example, if the Estimated Closing Inventory Value is $4,874,704, then the Purchase Price will be reduced by $33,500 [$100,000 x 0.335=$33,500]). If the Closing Inventory Value as determined pursuant to Section 5.10 is greater than the Estimated Closing Inventory Value, then Buyer shall within five (5) Business Days of receipt of such Closing Inventory Value calculation under Section 5.10 pay Seller an amount equal to 33 ½% of the amount by which the Closing Inventory Value exceeds the Estimated Closing Inventory Value, but in no event shall Buyer pay Seller more than the Closing Reduction Amount received by Buyer at Closing. If the Closing Inventory Value as determined pursuant to Section 5.10 is less than the Estimated Closing Inventory Value, then Seller shall within five (5) Business Days of receipt of such Closing Inventory Value calculation under Section 5.10 pay Buyer an amount equal to 33 ½% of the amount by which the Estimated Closing Inventory Value exceeds the Closing Inventory Value, but in no event shall such payment paid by Seller cause the Purchase Price realized by Buyer to be below zero. Any payment due by Seller under this Section 2.6(b) shall be first paid from the Escrow Account pursuant to the Escrow Agreement and thereafter from Seller's own funds. All such payments shall be by wire transfer of immediately available funds.

(c)    The Purchase Price payable by Buyer to Seller shall be reduced by the amount by which the Cure Costs exceed $43,162.

2.7    Assumed Contracts and Cure Costs. Pursuant to the Assignment Order, on or prior to the Closing, Seller shall assume and assign to Buyer all Assumed Contracts and Buyer shall pay all Cure Costs directly to the other party to each Assumed Contract.

2.8    Taxes.

(a)    To the extent that the transactions contemplated by this Agreement are not exempt from Taxes and except as otherwise set forth herein, Buyer shall be liable for all such Taxes, duties, costs and fees (and any penalties and interest associated with the foregoing, but excluding any income Taxes), arising from or relating to the consummation of the transactions contemplated by this Agreement or any Related Agreement. Seller and Buyer shall cooperate in timely making all filings, returns, reports and forms as necessary or appropriate to comply with the provisions of all applicable laws in connection with the payment of such Taxes, and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Taxes payable in connection therewith.

(b)    Except as otherwise set forth in this Agreement, all utility charges, rents or other payments under the Purchased Assets and all ad valorem, real property, personal property and similar Taxes with respect to the Purchased Assets (the "Prorated Expenses") shall be

14

prorated as of the Closing Date. To the extent possible, the Parties will calculate the Prorated Expenses as of the Closing Date and adjust the Purchase Price accordingly (using reasonable estimates where final information is not available). To the extent the Prorated Expenses cannot be calculated as of the Closing Date, Buyer shall make any required reimbursement to Seller promptly following the calculation of the Prorated Expense and Seller shall make any required reimbursement to Buyer as an ordinary course administrative expense of the Estate in accordance with requirements of the Bankruptcy Code.

2.9    Time and Place of Closing. The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Dinsmore & Shohl LLP, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202, within three (3) Business Day(s) after all conditions to Closing set forth in Article 6 of this Agreement have been satisfied or waived (the "Closing Date"). At the Closing, the Parties shall execute and deliver the Related Agreements. The transactions contemplated hereby shall take place pursuant to, and in accordance with, the terms and conditions hereof. The Closing will be effective as of 12:01 a.m. EDT on the Closing Date.

2.10    Purchase Price Allocation. Buyer and Seller shall allocate the Purchase Price (together with Assumed Liabilities properly included, if any) among the Purchased Assets in a manner consistent with the fair market values determined in good faith and on a reasonable basis by Buyer and Seller prior to the Closing Date. Such allocation shall be consistent with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder. In addition, Buyer and Seller shall prepare IRS Form 8594 and related exhibits and shall act in accordance with the allocation agreed to by the Parties on such Form 8594 and in the preparation, filing and audit of any and all Tax returns.

2.11    Adequate Assurance. Buyer agrees to furnish any reasonably necessary information pertaining to the satisfaction of the requirement of adequate assurances of future performance on Assumed Contracts as required under Section 365(f)(2)(B) of the Bankruptcy Code.

2.12    Subject to Approval of Bankruptcy Court. This Agreement is subject to the approval of the Bankruptcy Court and shall not become effective, nor shall it be deemed binding on either Party, until such approval is evidenced by a final order of such court.


ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the corresponding Schedules, Seller represents and warrants to Buyer as follows:

3.1    Organization. Each of the Sellers is a limited liability company or corporation, as applicable, duly organized, validly existing and in good standing under the laws of their respective states of organization. Schedule 3.1 sets forth each of the Sellers and their respective state of organization. Subject to the Bankruptcy Court's entry of the Sale Order, Seller has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to

15

perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

   3.2 <u>Execution and Delivery</u>. Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the Related Agreements by Seller, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by Seller, and no other action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements by Seller and the consummation of the transactions contemplated hereby and thereby. Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by Seller and constitutes, and upon the execution and delivery by Seller of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their terms.

   3.3 <u>Approvals and Filings</u>. Subject to obtaining the approvals set forth in <u>Schedule 3.3</u> ("<u>Seller Governmental Approvals</u>"), no consent, approval or action of, filing with or notice to any Governmental Authority on the part of Seller or on behalf of the Business is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby. Subject to obtaining the Assignment Order, no consent, approval or action of, filing with or notice to any Person (other than Governmental Authorities) on the part of Seller or on behalf of the Business is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby.

   3.4 <u>Brokers</u>. Except as set forth on <u>Schedule 3.4</u>, neither Seller nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Buyer arising out of the transactions contemplated by this Agreement.

   3.5 <u>Compliance with Laws</u>. With respect to the Business, except as set forth in <u>Schedule 3.5</u>, Seller has complied in all respects with and is in compliance with, and is not in default under, all applicable laws, regulations, orders and ordinances of any Governmental Authority other than any such non-compliance or default that would not create a Material Adverse Effect, and no claims have been filed against Seller alleging a violation of any such laws, regulations, orders or ordinances, and Seller has not, except as set forth in <u>Schedule 3.5</u>, received written (or, to Seller's Knowledge, oral) notice of any such violations. <u>Schedule 3.5</u> sets forth a true and correct list of all Permits necessary in connection with the operation of the Business, and, except as set forth on <u>Schedule 3.5</u>, Seller holds all such Permits in full force and effect, Seller is not in violation of such Permits, and there is no pending or, to the Knowledge of Seller, threatened revocation, cancellation or suspension of any such Permit.

   3.6 <u>Financial Statements and Related Matters</u>. Set forth on <u>Schedule 3.6</u> hereto are copies of the following financial statements of the Business (i) unaudited balance sheet as of December 31, 2010 (the "Latest Balance Sheet") and the related statement of income for the 12-month period then ended, (ii) unaudited balance sheets and statements of income for the fiscal years

ended December 28, 2008 and December 31, 2009 and (iii) unaudited profit and loss statement for the three months ended March 31, 2011 (the "Financial Statements"). The Financial Statements were prepared in accordance with internal policy, are true and correct in all material respects and fairly present, in all material respects, the financial condition and results of operations of Seller as of the dates and for the periods indicated, subject, in the case of interim statements, to normal year-end adjustments (which shall not be material) and the absence of footnotes.

3.7     Title to Assets; Sufficiency of Assets.

(a)     Except as set forth on Schedule 3.7 hereto, Seller has good and marketable title to, or a valid leasehold interest in or right to use pursuant to a license, the Purchased Assets. Except as described on Schedule 3.7 hereto, the Purchased Assets are in substantially good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the ordinary course of business. Seller has good and marketable title to those Purchased Assets reflected as owned by Seller on the Latest Balance Sheet, excluding Inventory and Supplies sold or consumed in the ordinary course of business since the date of such balance sheet.

(b)     Seller owns or leases all buildings, structures, improvements, machinery, equipment, and other tangible assets necessary for the conduct of the Business as presently conducted. This Agreement and the Related Documents, when duly executed and delivered by Seller to Buyer at the Closing, will effectively vest in Buyer good and marketable title to the Purchased Assets, subject only to the Permitted Liens.

3.8     Litigation; Orders.   Except as set forth on Schedule 3.8 hereto, (a) there are no actions, suits, arbitration proceedings, grievances, complaints, charges, proceedings, orders, investigations or claims pending or, to the Knowledge of Seller, threatened against or affecting Seller related to the Business or the Purchased Assets at law or in equity which, if adversely decided, would have a Material Adverse Effect, (b) to the Knowledge of Seller, Seller is not subject to any governmental investigations or material inquiries related to the Business or the Purchased Assets which, if adversely decided, would have a Material Adverse Effect, and (c) Seller is not, with respect to the Business, subject to any order of any Governmental Authority (or settlement enforceable therein).

3.9     Employee Benefit Plans.

(a)     Schedule 3.9 hereto sets forth a complete and correct list of each Employee Benefit Plan.  To the Knowledge of Seller, each Employee Benefit Plan has been maintained, funded and administered in accordance with its terms and in all material respects complies in form and in operation with the applicable requirements of ERISA and the IRC. All contributions and premium payments required to be made with respect to any Employee Benefit Plan for time periods ending on the Closing Date have been made as of the Closing Date. Other than routine claims for benefits, there is no action, suit, proceeding, audit, hearing, investigation, claim or lawsuit pending or, to the Knowledge of Seller, threatened against or relating to an Employee Benefit Plan. There has been no investigation or audit of any Employee Benefit Plans

17

by the Internal Revenue Service or Department of Labor within the last three years.  Buyer is under no obligation to continue any Employee Benefit Plan.

(b)     Each Employee Benefit Plan that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC has received a favorable determination letter from the IRS or may reasonably rely on the opinion or notification letter received by the sponsor of a prototype plan adopted by Seller, if applicable, and to the Knowledge of Seller, there is no event or circumstance that will or could give rise to disqualification or loss of tax-exempt status of any such Employee Benefit Plan or related trust.  Each such Employee Benefit Plan has been timely amended to include the interim amendments required by the applicable cumulative list pursuant to IRS Revenue Procedure 2007-44.

(c)     To the Knowledge of Seller, no non-exempt "prohibited transaction" (within the meaning of IRC Section 4975 or Section 406 of ERISA) has occurred with respect to any Employee Benefit Plan, and no fiduciary of any Employee Benefit Plan has any material liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any Employee Benefit Plan.

(d)     None of the Employee Benefit Plans is a plan providing medical, health or life insurance or other welfare-type benefits for current or future retired or terminated employees, their spouses, or their dependents or for any other Person not actively employed by Seller (other than in accordance with COBRA) nor has Seller committed to provide any such type of retiree or terminated employee, spouse or dependent benefits.  Seller and the ERISA Affiliates are in material compliance with the requirements of COBRA.

(e)     Neither Seller nor any ERISA Affiliate has any liability under Title IV of ERISA that could become a liability of Buyer, including on account of a "partial withdrawal" or a "complete withdrawal"  (within the meaning of Sections 4205 and 4203 of ERISA, respectively) from any multiemployer plan (as defined in Section 3(37) of ERISA) or a failure to make any required contribution to any such multiemployer plan.  Neither Seller nor any ERISA Affiliate has sponsored within the last six years any defined benefit plan.

(f)     Seller has delivered or made available to Buyer: (i) true and complete copies of all plan documents, amendments, trust agreements, insurance contracts, administrative contracts and summary plan descriptions with respect to the Employee Benefit Plans; (ii) summary descriptions of any Employee Benefit Plans not otherwise in writing; (iii) the IRS Form 5500 and financial report filed in each of the most recent three plan years for any Employee Benefit Plan subject to such filing requirements; and (iv) all material correspondence with any Governmental Authority relating to any outstanding controversy, audit, or closing agreement request.

3.10    Labor Matters.  Except as set forth in Schedule 3.10 hereto, with respect to the Business (i) Seller is not a party to any collective bargaining agreement and does not have any relationship with any labor organization, (ii) Seller is in compliance in all material respects with all applicable laws relating to employment and employment practices, the employment of labor, and, to

the Knowledge of Seller, has not engaged in any unfair labor practice or unlawful employment practice, and there are no pending or unremedied grievances or unfair labor practices or other employment-related claims against Seller, (iii) there is no labor strike, slowdown or work stoppage relating to Seller pending or, to the Knowledge of Seller, threatened against Seller, (iv) Seller has not experienced any work stoppages or been a party to any proceedings before the National Labor Relations Board or other Governmental Authority involving any issues for the three years prior to the date hereof or been a party to any arbitration proceeding arising out of or under collective bargaining agreements for the three years prior to the date hereof, (v) Seller has not within the three years prior to the date hereof received notice of any employment-related charge or complaint against Seller before the Equal Employment Opportunity Commission or the Department of Labor or any other Governmental Authority, and (vi) Seller has not implemented any plant closing or mass layoff of employees that could implicate the WARN Act or similar state, local or foreign laws or regulations.

3.11    Taxes. Except as set forth on Schedule 3.11 attached hereto:

(a)    During the last three years, Seller has filed all Tax returns that it was required to file under applicable laws and regulations, and all such Tax returns are true and correct in all material respects. All Taxes due and owing by (or with respect to the operations of) Seller shown on any such Tax Returns have been paid (or Seller has made adequate provision for such Taxes) or are being contested in good faith. Seller has not received any written notice from any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is subject to taxation by that jurisdiction.

(b)    To Seller's Knowledge, no foreign, federal, state, or local Tax audits or administrative or judicial Tax proceedings are pending or being conducted with respect to Seller. Seller has not received from any foreign, federal, state, or local taxing authority (including jurisdictions where Seller has not filed Tax Returns) any (i) written notice indicating an intent to open an audit or other review, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority against Seller.

3.12    Real Property. Seller does not own any real property which is used or intended to be used, or otherwise related to, the Business. Schedule 3.12(a) sets forth the address of each Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease). Seller has delivered or made available to Buyer a true and complete copy of each such Lease. Except as set forth in Schedule 3.12(b), with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) neither Seller nor, to Seller's Knowledge, any other party to the Lease is in breach or default under such Lease, and to Seller's Knowledge no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease; (iii) Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (iv) Seller's possession and quiet enjoyment of the Leased

19

Real Property under such Lease has not been disturbed, and to Seller's Knowledge, there are no disputes with respect to such Lease; (v) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited                        in                        full;                        and (vi) Seller does not, and will not in the future, owe any brokerage commissions or finder's fees with respect to such Lease.

     3.13   Insurance.   Schedule 3.13 hereto lists all policies of insurance owned, held, or maintained by or for the benefit of Seller with respect to the Business or insuring the Purchased Assets, including the type and amount of coverage and the expiration dates of the policies and the loss run for the past three years.  Except as set forth on Schedule 3.13 attached hereto, Seller has not received any written notice within the last 90 days threatening suspension, revocation, modification or cancellation of any insurance policy or a material increase in any premium in connection therewith or informing Seller that any coverage listed on Schedule 3.13 attached hereto will or may not be available in the future on substantially the same terms as now in effect.  Except as set forth on Schedule 3.13, Seller does not have any self-insurance or co-insurance programs with respect to the Business.  Except as listed on the loss run set forth on Schedule 3.13 or as otherwise set forth on Schedule 3.13, Seller has not, with respect to the Business, made any insurance claims during the past one year.

     3.14   Contracts.

        (a)   Schedule 3.14 contains a list or description of the Contracts that meet the following requirements (collectively, the "Material Contracts"):

           (i)   all mortgages, indentures, notes, bonds or other agreements relating to indebtedness for borrowed money;

           (ii)   any agreement (or agreements) for the lease of personal property from third parties providing for annual lease payments, individually or in the aggregate, in excess of $10,000;

           (iii)   any agreement under which Seller has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) indebtedness or under which it has imposed (or may impose) a Lien, other than any Permitted Lien, on any of the Purchased Assets; and

           (iv)   any other agreement (or group of related agreements) not otherwise listed on Schedule 3.14 involving individually (or in the aggregate) more than $10,000 payable by or to Seller annually.

        (b)   Seller is permitted under the Bankruptcy Code to assume and assign each of the Material Contracts and Leases.  The Material Contracts and Leases constitute all of the Contracts which are material to the Business.

20

(c)    Except for defaults resulting solely from Seller filing its petition for the Chapter 11 Case and as set forth in Schedule 3.14(c), with respect to each of the Material Contracts: (i) such Material Contract is legal, valid, binding, enforceable and in full force and effect; and (ii) neither Seller nor, to Seller's Knowledge, any other party to the Material Contract is in breach or default under such Material Contract, and to Seller's Knowledge no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of payments due under such Material Contract.

3.15    Hazardous Materials.  Seller has no Knowledge of the presence of any Hazardous Materials, other than de minimis amounts of Hazardous Materials stored in compliance with applicable Environmental Laws, such as routine cleaning materials, located on any of the Leased Real Property.  To Seller's Knowledge, there has been no Release of any Hazardous Materials on the Leased Real Property.  To Seller's Knowledge, Seller has operated the Business, and is currently in, compliance will applicable Environmental Laws.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the corresponding Schedules, Buyer represents and warrants to Seller as follows:

4.1    Organization.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Kentucky.  Buyer has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

4.2    Execution and Delivery.  The execution, delivery and performance of this Agreement and the Related Agreements by Buyer, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by Buyer, and no other action on the part of Buyer is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements by Buyer and the consummation of the transactions contemplated hereby and thereby.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes, and upon the execution and delivery by Buyer of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms.

4.3    No Conflicts.  The execution and delivery by Buyer of this Agreement and the Related Agreements, the performance of its obligations under this Agreement and the Related Agreements and the consummation of the transactions contemplated hereby and thereby do not and shall not:

21

(a)    Conflict with or result in a violation or breach of any of the terms, conditions or provisions of its articles of organization or operating agreement;

(b)    Conflict with or result in a violation or breach of any term or provision of any law, statute, rule, regulation or order applicable to Buyer; or

(c)    Conflict with or result in a violation or breach of, or constitute a default under, or require Buyer to obtain any consent or approval under the terms of, or give any third party the right to terminate, modify or accelerate any obligation under, any contract or license to which Buyer is a party or by which any of Buyer's assets or properties is bound.

4.4    Governmental Approvals and Filings.  Except as specifically contemplated as set forth in this Agreement (including the obtaining of the Permits set forth on Schedule 4.4 ("Buyer Governmental Approvals")), no consent, approval or action of, filing with or notice to any Governmental Authority on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby.

4.5    Brokers.  Neither Buyer nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Seller.

4.6    Adequate Funds.  At the Closing, Buyer will have adequate funds available to it in order to consummate the transactions contemplated by this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder.

4.7    Adequate Assurances.  At the Closing, Buyer shall be capable of satisfying the conditions contained in Section 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to any Assumed Contracts that Buyer seeks to include in the Purchased Assets.

ARTICLE 5
COVENANTS

5.1    Books and Records.

(a)    Access.  From and after the Closing, the Buyer shall provide the Seller or its successor (including, without limitation, a Liquidating Trustee to the extent one is appointed in the Bankruptcy Case), and the Seller, or its successor, shall provide to the Buyer reasonable access, during normal business hours, to the books, records and other data relating to the operation of the Business prior to the Closing in its possession to the extent that such access may be reasonably required by the requesting Party in connection with (a) the preparation of Tax returns, (b) the determination or enforcement of rights and obligations under this Agreement, (c) compliance with the requirements of any Governmental Authority, (d) in connection with any threatened or actual legal proceeding, including without limitation, any and all actions necessary for the wind down of the Debtors' bankruptcy estate including with respect to claims

22

reconciliation, completion of monthly operating reports and other bankruptcy requirements, or (e) in connection with any audit of the Business for any pre-Closing period. The Parties respective obligations hereunder shall survive until such time as the Seller or its successor (including without limitation, a Liquidating Trustee) is formally dissolved; provided that as long as Seller or its successor has books, records and other data it shall permit access thereto by Buyer for legitimate business reasons. During such period neither Party shall dispose of or destroy any books, records or other data relating to the operation of the Business or the Purchased Assets prior to the Closing unless such Party gives the other Party thirty (30) days' prior written notice thereof and the option to retain such books, records or other data or the Party is authorized to act pursuant to a court order.

(b)    Consumer Protection.    With respect to any personally identifiable consumer information and subject to the requirements of any existing or future law or regulation, the Buyer shall establish an Email Privacy Policy substantially similar to, and in all material respects consistent with, the Email Privacy Policy of the Seller, a copy of which is attached hereto as Schedule 5.1(b). An opt out process will be undertaken before the Closing to allow customers to opt out of the sale of certain personally identifiable customer records. The opt out notices will be provided by Seller to customers via e-mail and notices will be placed on the Seller's web site. Such notices will be in form and substance reasonably agreeable to Buyer. The notices will be sent and/or posted and will require customers to opt out by deadlines set forth in the Sale Order.

5.2    Employees.

(a)    Rehired Employees.    Buyer shall have the right, but not any obligation, to offer employment to each of the employees of Seller who remain actively employed at the Buyer Locations immediately prior to the Closing (other than the persons listed in Schedule 5.2(a)(i)) , including employees who are on disability leave, worker's compensation leave, or other leave or absence immediately prior to the Closing, on such terms as Buyer determines in its sole discretion.    Such individuals who receive and accept such offer by the Closing Date are hereinafter referred to as the "Rehired Employees".

(b)    Standard Procedure.    Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, (i) Buyer and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Rehired Employees, and (iii) Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Rehired Employee with respect to the portion of the year during which such Rehired Employees are employed by Buyer that includes the Closing Date, excluding the portion of such year that such Rehired Employees were employed by Seller.

(c)    No Rights Conferred Hereunder.    Nothing contained in this Agreement shall confer upon any Rehired Employee any right with respect to continuance of employment by Buyer, nor shall anything herein interfere with the right of Buyer to terminate the employment of any Rehired Employees at any time and for any or no reason, with or without notice, or restrict

23

Buyer, in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Rehired Employees after the Closing.

        (d)   <u>Seller's Cooperation in Hiring of Employees.</u>  Seller shall cooperate in all reasonable respects with Buyer and shall permit Buyer a reasonable period prior to the Closing Date (i) to meet with employees of Seller (including managers and supervisors) at such times as Buyer shall reasonably request, (ii) to speak with such employees' managers and supervisors who are being considered for employment by Buyer at such times as Buyer shall reasonably request, (iii) to distribute to such employees of Seller such forms and other documents relating to potential employment by Buyer after the Closing as Buyer may reasonably request, and (iv) to permit Buyer's counsel, upon request and execution of any written authorizations Seller reasonably deems appropriate, to review personnel files and other relevant employment information regarding employees of Seller.

        (e)   <u>WARN Act.</u>  Seller shall be solely responsible for any and all notices, payments, fines or assessments due to any Governmental Authority, pursuant to any applicable federal, state, local or foreign law, common law, statute, rule, regulation or ordinance with respect to the employment, discharge or layoff of employees by Seller as of or before the Closing, including but not limited to the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection with the foregoing (jointly, referred to throughout this Agreement as the "WARN Act") with respect to employees of Seller.  As of the Closing, Seller shall provide to Buyer a list of all layoffs, by location, implemented by Seller within the 90 day period preceding the Closing.

        (f)   <u>No Third-Party Beneficiaries.</u>  The provisions of this Section are for the sole benefit of the Parties to this Agreement and their permitted successors and assigns, and nothing herein, expressed or implied, shall give or be construed to give any Person, other than the Parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

    5.3   <u>Adequate Assurances.</u>  With respect to each Assumed Contract included in the Purchased Assets, Buyer shall use commercially reasonable efforts to provide adequate assurance of the future performance of such Assumed Contract by Buyer as required by the Bankruptcy Code. Buyer shall use commercially reasonable efforts to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.  Notwithstanding the foregoing, neither Buyer nor any of its Affiliates shall be required to make any payments or security deposits or provide any guarantees, letters of credit or other forms of credit support.

    5.4   <u>Performance under Assumed Contracts.</u>  From and after the Closing, Buyer shall fully satisfy, discharge and perform all of the obligations assumed under the Assumed Contracts pursuant to Section 2.3(a) above.

    5.5   <u>Cooperation.</u>  Subject to the terms and conditions herein provided, the Parties shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the

conditions (whether set forth in this Agreement or otherwise) necessary to effect the consummation of the transactions contemplated by this Agreement. In furtherance of the foregoing, Seller shall use commercially reasonable efforts to obtain, in a diligent and prompt manner, the Necessary Consents and Seller Government Approvals (and any other consents, approvals or agreements), and to give all notices and make all filings as may be necessary to authorize, approve or permit the full and complete sale, conveyance assignment and transfer of the Purchased Assets, free and clear of any Liens (other than Permitted Liens).

5.6    **Further Assurances.**  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at Buyer's reasonable request and without further consideration, Seller will execute and deliver to Buyer such other instruments of sale, transfer, conveyance and assignment, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer, and to confirm Buyer's title to, all of the Purchased Assets, and, to the full extent permitted by law, to put Buyer in actual possession and operating control of the Purchased Assets and to assist Buyer in exercising and perfecting all rights with respect thereto, and otherwise to cause Seller to fulfill its obligations under this Agreement.

5.7    Access to Information; Confidentiality.

(a)    From the date hereof until the Closing, upon reasonable notice, Seller will cause each of Seller's representatives and Affiliates to: (i) afford the officers, employees, agents, consultants, accountants, potential financing sources, and other representatives of Buyer reasonable access, during normal business hours, to the offices, properties, books and records of Seller and its Affiliates relating to the Business at the Buyer Locations, and (ii) furnish to the officers, employees, agents, consultants, accountants, potential financing sources and other representatives of Buyer such additional financial and operating data and other information regarding the Purchased Assets and the Business as Buyer may from time to time reasonably request; provided, however, that such investigation will not unreasonably interfere with any of the businesses or operations of Seller or its Affiliates.

(b)    Buyer will treat, and will cause its representatives and Affiliates to treat, all non-public information concerning Seller furnished to or reviewed by Buyer or its representatives or Affiliates in connection with the transactions contemplated by this Agreement in accordance with any confidentiality agreement entered into by the Parties (or their Affiliates) prior to the date of this Agreement in connection with Seller's offer to sell the Business (each a "Confidentiality Agreement"). Upon the consummation of the transactions contemplated hereby, any Confidentiality Agreement restricting Buyer's ability to disclose information related to the Business will terminate and be of no further force or effect. From and after Closing, Seller shall maintain the confidentiality of all information (and shall cause its officers, employees and other representatives to maintain the confidentiality of all information) related to the Purchased Assets and Business related thereto, unless such information is publicly available or Seller is required to disclose such information by law or court order.

25

5.8    Public Announcements.    No Party shall issue any press release or public announcement relating to this Agreement or the transactions contemplated hereby without the prior consent of the other Party (such consent not to be unreasonably withheld), except for such disclosures as are specifically contemplated hereby and such disclosures to such professional advisors as may be necessary or appropriate in order to consummate the transactions contemplated hereby, including the filing of this Agreement with the Bankruptcy Court promptly after the date hereof. The provisions of this Section 5.8 shall be subject to the Parties' obligations to comply with applicable requirements of law, including any order of the Bankruptcy Court, provided, however, that in the case of any disclosure required under law the disclosing Party shall, if practicable, provide the other Party reasonably advanced notice of, and opportunity to comment on, any such disclosure.

5.9    Permits and Liquor License Transfers.    In addition to the other obligations contained in this Agreement of Seller to transfer the Permits to Buyer, Seller and Buyer covenant to use their best efforts from and after the date of this Agreement, to cause the transfer of the Permits related to the Purchased Assets, including all liquor licenses identified on Schedule 3.5 that relate to Purchased Assets, at Closing. For Permits that are not transferable under the terms of such Permit or applicable law, Seller will cooperate with Buyer, at no expense to Seller, in assisting Buyer in obtaining such Permits. If Governmental Approval for transfer of liquor licenses have not occurred on or prior to the Closing, Buyer and Seller will (to the extent permitted by law) enter management or other agreements with respect to such liquor licenses (but not including in Cleveland) on customary terms that allow Buyer to operate and obtain the benefits of Permits, Business and Purchased Assets from the Closing until Governmental Approval of transfer of such Permit is obtained. The obligations under this Section 5.9 will continue after Closing for those Permits not yet transferred or obtained. Nothing in this Section 5.9 shall be deemed a waiver of Buyer's conditions to Closing under Sections 6.2(d) and (h).

5.10    Inventory.    Seller and Buyer shall retain an independent third-party experienced in inventorying book stores as Seller and Buyer may mutually agree (the "Third-Party Vendor") to conduct a physical inventory of the Buyer Locations in connection with the Closing (the "Physical Inventory"). The Physical Inventory shall be conducted as close to Closing as reasonably practicable and shall be adjusted based on sales records of the Business at the Buyer Locations before and after Closing (which shall be certified as accurate by Seller, for periods it controls the Business at the Buyer Locations, and Buyer, for periods it controls the Business at the Buyer Locations, to the Third-Party Vendor) to determine the actual inventory on hand as of the Closing. The Inventory shall, for purposes of this Section 5.10, be valued at retail price, except all "defective", "as is" and "seasonal" Inventory (as such terms are customarily understood in the bookstore liquidation market) shall be valued at 50% of retail price. Said valuation shall be conducted in accordance with customary practice in the bookstore liquidation market. The Third-Party Vendor shall calculate the value of the inventory using such formula and shall certify to Seller and Buyer such value as of the Closing (the "Closing Inventory Value"). The determination of the Third-Party Vendor shall be final and conclusive, absent manifest error. The costs and expense of conducting the Physical Inventory, including the fees of the Third-Party Vendor, shall be equally divided between the Buyer and Seller.

26

5.11   Operations of the Business Prior to Closing.  From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller shall (i) operate the Business and Purchased Assets only in the ordinary course consistent with past practices, (ii) not hold any going out of business or "fire sale" or other sales at any Buyer Location or respecting any of the Purchased Assets (except for normal discounts on Inventory in the ordinary course of business), (iii) use reasonable efforts to preserve intact its business organization, employee relations and assets and maintain its rights and franchises, (iv) take no action which would (a) materially adversely affect the ability of any Party to obtain any Necessary Consents or other items required for the transactions contemplated hereby, or (b) materially adversely affect the ability of any Party to perform its covenants and agreements under this Agreement, and (v) not discharge or reduce the compensation of any employee at any Buyer Location (except for dismissals for employee misconduct consistent with historical practice of Seller).

5.12   Transition Services Agreement.  Buyer and Seller shall, from and after the date of this Agreement, negotiate in good faith to enter a transition services agreement ("Transition Services Agreement") wherein Buyer agrees from and after Closing to provide back-office support services for post-Closing activities of Seller in transitioning and winding-up its affairs, post-closing activities of going-out-of business sales of Excluded Assets and Seller's transfer of Excluded Assets to buyers of businesses using Excluded Assets, as may be reasonably agreed to by Buyer and Seller. Buyer shall have no obligation to incur any out-of-pocket expenses to third parties in connection with providing services under the Transition Services Agreement.   The Transition Services Agreement shall terminate at a reasonable time following Closing as reasonably agreed to by Buyer and Seller based on anticipated post-Closing activities of Seller, going-out-of-business sales and transfers by Seller to buyers of businesses using Excluded Assets.

5.13   Group Health Plan.  Seller will use its reasonable best efforts from and after the date hereof to cooperate with Buyer in assumption and assignment of the Seller's current group health, dental and vision plans, including separate motion to the Bankruptcy Court for a separate Assignment Order respecting such group health, dental and vision plans.  Seller will not be required to fund any cure costs in connection therewith.  Nothing herein shall require Buyer to seek such assumption and assignment if Buyer determines the group health, dental and visions plans may not be assumed and assigned on terms agreeable to Buyer.

ARTICLE 6
CONDITIONS TO CLOSING

6.1   Conditions to Obligations of Seller to Close.   The obligation of Seller, to consummate the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions (any of which may be waived in whole or in part by Seller):

(a)   Representations and Warranties.  The representations and warranties of Buyer under this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though made on and as of the Closing Date, except that all

27

representations and warranties which are qualified as to materiality will be true and correct in all respects.

(b)    Observance and Performance.  Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date.

(c)    No Legal Actions.  No Governmental Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.  No Person shall have instituted a proceeding which shall not have been previously dismissed seeking to restrain, enjoin or prohibit the consummation of the transactions contemplated by this Agreement or seeking damages with respect thereto.

(d)    Sale Order.  The Sale Order shall have been entered by the Bankruptcy Court.

(e)    Certificate.  Buyer shall furnish to Seller a certificate duly signed by an authorized officer of Buyer to the effect that the conditions contained in Sections 6.1(a) and (b) have been satisfied, and that the resolution referenced in Section 6.1(f)(iii) is in full force and effect and has not been amended, altered or rescinded between the date of its adoption and the Closing Date.

(f)    Closing Deliveries.  At the Closing, Buyer shall deliver the following to Seller:

(i)    the Purchase Price by wire of immediately available funds to one or more bank accounts, which bank accounts shall be designated by Seller in consultation with the Creditors' Committee and Lenders, at least two (2) Business Days prior to the Closing;

(ii)    the Bill of Sale, duly executed by Buyer;

(iii)    a copy of the resolutions of the manager of Buyer approving this Agreement and the Related Agreements;

(iv)    a good standing certificate for Buyer, dated a recent date prior to the Closing Date and certified by the Secretary of State of Buyer's state of incorporation or organization;

(v)    an incumbency certificate, dated the Closing Date, signed by a duly authorized officer of Buyer and giving the name and bearing a specimen signature of each individual who shall be authorized to sign, in the name and on behalf of Buyer, this Agreement and the Related Agreements;

(vi)    the Escrow Agreement and the Transition Services Agreement,

28

both duly executed by Buyer; and

(vii)   all other documents and instruments reasonably requested by Seller to effect the transactions contemplated by this Agreement.

6.2    Conditions to Obligation of Buyer to Close.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions (any of which may, in Buyer's sole discretion, be waived in whole or in part):

(a)    Representations and Warranties.  The representations and warranties of Seller under this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though made on and as of the Closing Date, except that all representations and warranties which are qualified as to materiality and/or Material Adverse Effect shall be true and correct in all respects.

(b)    Observance and Performance.  Seller shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date.

(c)    No Legal Actions.  No Governmental Authority shall have issued an order not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.  No Person shall have (i) commenced an investigation or instituted a proceeding which shall not have been previously dismissed seeking to restrain, enjoin or prohibit the consummation of the transactions contemplated by this Agreement or seeking damages with respect thereto or (ii) appealed any aspect of the Sale Order or Assignment Order.

(d)    Governmental Approvals.  Seller shall have received all Seller Governmental Approvals in a form reasonably satisfactory to Buyer, and Buyer shall have received a copy of each such Seller Governmental Approval, and Buyer shall have received all Buyer Governmental Approvals in a form reasonably satisfactory to Buyer and Seller shall have received a copy of each such Buyer Governmental Approval.  Notwithstanding the foregoing, receipt of Seller Governmental Approvals and Buyer Governmental Approvals for transfer of liquor licenses shall not be a condition to Buyer's obligations to consummate the transactions contemplated by this Agreement.

(e)    Assumed Contracts.  Seller shall have assumed all Assumed Contracts and paid all Cure Costs with respect thereto.

(f)    Necessary Consents.  Seller shall have obtained all Necessary Consents not eliminated by the Assignment Order, in a form reasonably satisfactory to Buyer, and Buyer shall have received a copy of each such Necessary Consent.

(g)    Certificate.  Seller shall furnish to Buyer a certificate duly signed by an authorized officer of Seller to the effect that the conditions contained in Sections 6.2(a) and (b)

29

have been satisfied, and that the resolution referenced in Section 6.2(i)(iii) is in full force and effect and has not been amended, altered or rescinded between the date of its adoption and the Closing Date.

(h)      Permits.  Buyer and its Affiliates shall have obtained permission, in form reasonably acceptable to Buyer, from all applicable Governmental Authorities to use the all Permits necessary in connection with the operation of the Business and/or the Purchased Assets. Notwithstanding the foregoing, receipt by Buyer of Permits to sell alcoholic beverages shall not be a condition to Buyer's obligations to consummate the transactions contemplated by this Agreement.

(i)      Closing Deliveries.  At the Closing, Seller shall deliver the following to Buyer:

(i)      the Bill of Sale duly executed by Seller;

(ii)      a good standing certificate for Seller, dated a recent date prior to the Closing Date and certified by the Secretary of State of Seller's state of organization;

(iii)      a copy of the resolutions of the board of directors, shareholders, members and managers of Seller, as required by applicable law and Seller's governing documents, approving this Agreement and the Related Agreements;

(iv)      an incumbency certificate, dated the Closing Date, signed by a duly authorized officer of Seller and giving the name and bearing a specimen signature of each individual who shall be authorized to sign, in the name and on behalf Seller, this Agreement and the Related Agreements;

(v)      the Transition Services Agreement duly executed by Seller and the Escrow Agreement duly executed by Seller and the Escrow Agent; and

(vi)      all other documents and instruments reasonably requested by Buyer to effect the transactions contemplated by this Agreement.

(j)      Bankruptcy Conditions.  The Bankruptcy Court shall have entered and approved the Bid Procedures Order, the Sale Order and the Assignment Order in form and substance satisfactory to Buyer (including an order that the only liabilities to be assumed by Buyer are the Assumed Liabilities), and all such orders shall have become final orders.  In addition, if the Sale Order and the Assignment Order are not final and non-appealable, (i) the Sale Order shall:  (A) contain a finding by the Bankruptcy Court that Buyer is a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m); and (B) provide that any stay of the Sale Order is waived pursuant to Bankruptcy Rules 6004(g) and 6006(d); and (ii) any objections to the motion for entry of the Sale Order and Assignment Order shall have been consensually resolved, withdrawn or overruled prior to the time of the entry of, or overruled by, the Sale Order.

(k)     Material Adverse Effect.  There shall have occurred no Material Adverse Effect.

## ARTICLE 7
## BANKRUPTCY MATTERS

7.1    Section 363 Covenants and Milestones.  Seller covenants and agrees that:

(a)     Seller will take such actions as are reasonably necessary to obtain entry of (i) the Sale Order, and (ii) the Assignment Order which shall include a finding of adequate assurance of future performance by the Buyer, no later than April 29, 2011;

(b)     Seller will take all necessary actions related to the sale process required by the Bid Procedures Order; and

(c)     No later than one business day following the conclusion of the Auction, Seller shall circulate a notice to all counter-parties to Assumed Contracts (as well as such other parties as Buyer shall have reasonably designated prior to such date) setting forth the proposed Cure Amount due under such Assumed Contract (each a "Cure Notice").

7.2    Bankruptcy Covenants.  Seller shall comply (or obtain an order from the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer, waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the purchase and sale of the Purchased Assets under this Agreement, and the assumption and assignment by Seller to Buyer of the Assumed Contracts (whether pursuant to the Bid Procedures Order or otherwise).  Notice of the hearing or a motion to issue the Sale Order, the Sale Order and the objection deadline relating thereto shall be served by Seller in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure and any applicable local rules of the Bankruptcy Courts, as applicable, on all Persons required to receive notice in the Chapter 11 Case under such rules, including, but not limited to, all Persons that have asserted Liens, encumbrances or other interests in the Purchased Assets, all non-Seller parties to all assumed Contracts and other contracts included in the Purchased Assets, counsel to the Creditors' Committee, the Office of the United States Trustee, and each of the Seller's known creditors.

## ARTICLE 8
## TERMINATION

8.1    Termination.  This Agreement may be terminated at any time before the Closing if any of the following occur:

(a)     by mutual written agreement of Buyer and Seller;

(b)     by either Buyer or Seller, upon written notice to the other Party, if any Governmental Authority shall have issued an order, decree or ruling or initiated an investigation

31

or taken any other action seeking to restrain, enjoin or otherwise prohibit the transactions contemplated hereby;

(c)    by Buyer, upon written notice to Seller, if a motion to dismiss the Chapter 11 Case or a motion to convert the Chapter 11 Case or the appointment of a trustee, receiver, liquidator or other similar person for the purpose of liquidating any of the Purchased Assets other than pursuant to this Agreement has been approved by the Court with respect to the Chapter 11 Case;

(d)    (i) by Seller if satisfaction of any condition in Section 6.1 above is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement) and (ii) by Buyer if satisfaction of any condition in Section 6.2 above is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement);

(e)    by either Buyer or Seller after 5:00 p.m. (Eastern) on April 30, 2011, if the Closing has not occurred by such date (unless the Party seeking to terminate is then in material breach of its obligations, representations or warranties under this Agreement), unless Buyer is selected as the Back-Up Bidder, in which case by either Buyer or Seller after 5:00 p.m. (Eastern) on May 4, 2011 (unless the Party seeking to terminate is in material breach of its obligations, representations or warranties under this Agreement) if the Closing has not occurred by such date;

(f)    by Buyer, upon written notice to Seller, if (i) the Bankruptcy Court shall not have entered the Sale Order and the Assignment Order on or before April 29, 2011;

(g)    by Seller, upon written notice to Buyer, if Seller (i) enters into an agreement to effect an Alternative Transaction prior to commencement of the Sale Hearing and Buyer is not selected as the Back-Up Bidder; (ii) selects a Person other than Buyer as the Prevailing Bidder (as such term is defined in the Bid Procedures Order) and Buyer is not selected as the Back-Up Bidder; (iii) consummates an Alternative Transaction pursuant to an agreement entered into prior to commencement of the Sale Hearing; or (iv) files a plan of reorganization which shall be funded by an Alternative Transaction pursuant to an agreement entered into prior to commencement of the Sale Hearing;

(h)    by Buyer, upon written notice to Seller, if Seller (i) consents to or enters into an agreement to effect an Alternative Transaction and Buyer is not selected as the Back-Up Bidder; (ii) selects a Person other than Buyer as the Prevailing Bidder (as such term is defined in the Bid Procedures Order) and Buyer is not selected as the Back-Up Bidder; (iii) consummates an Alternative Transaction; or (iv) files a plan of reorganization which shall be funded by an Alternative Transaction

8.2    Remedies.  Upon termination of this Agreement pursuant to Section 8.1, except for Sections 5.7 and 5.8 and Articles 8 and 9, which shall survive to the fullest extent permitted by law, this Agreement shall be void and of no further effect, and neither Buyer nor Seller shall have any liability by reason of this Agreement or the termination thereof, provided that if such termination

32

results from a Party's breach of a representation, warranty, covenant or other provision hereunder, the non-breaching Party shall have all remedies available to it under this Agreement (with respect to all such breaches which occurred prior to the termination of this Agreement) at law, in equity or otherwise. Notwithstanding the foregoing or any other provision contained in this Agreement:

(a)    In addition to any other remedies set forth herein, in the event of a breach or default by either Party under this Agreement after entry of the Sale Order by the Bankruptcy Court, the other Party shall be entitled to all of its remedies at law and in equity.

(b)    If Seller selects a party other than Buyer as the Prevailing Bidder (as such term is defined in the Bid Procedures Order), and Buyer's bid (at the time of selection of the Successful Bidder) is the second highest bid, then Buyer agrees to serve as a back-up bidder (the "Back-Up Bidder") and keep its bid (at the time of selection of the Successful Bidder) in place as a back-up bid (the "Back-Up Bid"), through 5:00 p.m. (Eastern) on May 4, 2011, subject to Buyer's right to terminate this Agreement or the Back-Up Bid pursuant to Section 8.1 above or pursuant to any additional terms and conditions as may be agreed to by the Parties at the Auction. If Seller does not notify Buyer that its Back-Up Bid has been selected as the Successful Bidder by 5:00 p.m. (Eastern) on May 4, 2011, then this Agreement and the Back-Up Bid shall be deemed to be null and void and of no further effect, except to the extent this Agreement or the Back-Up Bid provides that its terms and conditions shall survive termination. Alternatively, if Seller notifies Buyer that its Back-Up Bid has been selected as the Successful Bid by 5:00 p.m. (Eastern) on May 4, 2011, then Buyer and Seller shall proceed to consummate the Back-Up Bid, subject to Buyer's right to terminate this Agreement or the Back-Up Bid pursuant to Section 8.1 above or pursuant to any additional terms and conditions as may be agreed to by the Parties at the Auction. Any proposed Closing pursuant to Back-Up Bid of Buyer shall be subject to Buyer's conditions to Closing set forth in this Agreement and the Closing shall occur at such time as Buyer selects and Seller approves (which approval may not be unreasonably withheld or delayed), but which must be within fourteen (14) days of written notice that Buyer is the Successful Bidder. For purposes of clarification and not intended to enlarge or restrict Buyer's conditions to Closing set forth in this Agreement, Buyer shall, at its election, not be required to consummate the Back-Up Bid if there has been any material deterioration in the Purchased Assets or operations of the Business since the date of this Agreement, including, without limitation, (i) any of the Buyer Locations have closed or reduced hours of operation since the date of this Agreement, or (ii) the level or quality of Inventory maintained at any of the Buyer locations has materially deteriorated below the level and quality maintained as of the date of this Agreement.

8.3    Extension; Waiver.  At any time prior to the Closing, Seller, on the one hand, or Buyer, on the other hand, may (i) extend the time for performance of any of the obligations or acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto, (iii) waive compliance with any of the agreements of the other Party contained herein, or (iv) waive any condition to its obligations hereunder. Any agreement on the part of Seller, on the one hand, or Buyer, on the other

hand, to any such extension or waiver shall be valid only if set forth in writing and signed by such Party.

## ARTICLE 9
## MISCELLANEOUS

9.1    <u>Expenses</u>.   Except as specifically set forth in this Agreement or any Related Agreement, the Parties shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any brokers, finders, investment bankers, attorneys, accountants and other advisors, in connection with this Agreement, the Related Agreements, and the transactions contemplated hereby and thereby.  In any action or proceeding commenced in by reason of a breach of this Agreement or any Related Agreement, the prevailing Party therein shall be entitled to an award of its reasonable attorneys' fees and costs.

9.2    <u>Notices</u>.    All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be (a) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (b) transmitted by hand delivery, (c) sent by facsimile, (d) sent by nationally recognized overnight courier for next Business Day delivery, addressed as follows or (e) sent by electronic mail:

        (a)    <u>If to Seller:</u>

             with a copy (which shall not constitute notice) to:

34

Dinsmore & Shohl LLP
Attention:  Kim Martin Lewis, Esq.
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone:  (513) 977-8200
Facsimile:  (513) 977-8141
Email:  kim.lewis@dinslaw.com

and

Lowenstein Sandler PC
Attn:  Bruce Nathan
65 Livingston Avenue
Roseland, New Jersey  07068

(b)      If to Buyer:

Booksellers Enterprises, LLC
300 West Vine St., Ste. 2200
Lexington, Kentucky  40507
Attention:  Robert P. Langley, Manager
Telephone:  (859) 253-2255
Facsimile:  (859) 254-6002
Email:robert.langley@langleyproperty.com

with a copy (which shall not constitute notice) to:

Gary W. Barr, Esq.
300 West Vine St., Ste. 2200
Lexington, Kentucky  40507
Telephone:  (859) 231-3061
Facsimile:  (859) 254-6002
Email:gbarr@langleyproperty.com

or, in each case, such other address as may be specified in writing to the other Party in the
manner set forth in Section 9.2.

All such notices, requests, demands, waivers and other communications shall be deemed
to have been received (v) if by first-class, registered or certified mail, on the fifth Business Day
after the mailing thereof, (w) if by hand delivery, then immediately upon such delivery, (x) if by
facsimile, then upon the date and time of the transmission of such facsimile, (y) if by nationally

35

recognized overnight courier, on the next Business Day after deposit with such courier and (z) if sent by electronic mail, upon confirmation of receipt by the addressee.

9.3 Amendment; Waivers, Etc. No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

9.4 Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.5 Assignment. Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned by either Party without the prior written consent of the other Party. No permitted assignment of this Agreement by a Party will relieve the Party of any of its obligations under this Agreement. Notwithstanding the foregoing, Buyer may assign all or part of its rights to acquire the Purchased Assets hereunder to one or more Affiliates of Buyer as Buyer may designate on or prior to Closing; provided Buyer shall remain liable for its obligations hereunder.

9.6 Parties in Interest. This Agreement and the Related Agreements shall be binding upon and inure solely to the benefit of the Parties and their successors and permitted assigns, and nothing in this Agreement or any Related Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement or any Related Agreement. Seller shall be jointly and severally liable hereunder.

9.7 Counterparts; Facsimile Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties. Any Party may execute this Agreement by facsimile signature and the other Parties will be entitled to rely upon such facsimile signature as conclusive evidence that this Agreement has been duly executed by such Party. Any Party may deliver such counterparts by facsimile transmission or by electronic mail in portable document format (.pdf) or tagged image file format (.tif).

9.8 Governing Law. Except to the extent inconsistent with the Bankruptcy Code, this Agreement and the Related Agreements shall be governed by and construed and enforced in accordance with the laws of the State of Ohio, without regard to its conflicts of law rules.

9.9 Jurisdiction. At any time prior to the closing of the Chapter 11 Case, each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Related Agreement shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding. At any time after the closing of the Chapter 11 Case, each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Related Agreement

36

shall be commenced and maintained in the United States District Court for the Eastern District of Kentucky, and such court shall have exclusive jurisdiction over any such proceeding. Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, any Related Agreement or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or any Related Agreement.

9.10    Severability. If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever, so long as this Agreement, taken as a whole, still expresses the material intent of the Parties. The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

9.11    Entire Agreement. This Agreement and the Related Agreements constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof. There are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein.

9.12    Employees Not Third-Party Beneficiaries. Nothing in this Agreement or the Related Agreements is intended to confer upon any past, present or future employee of Seller or its Affiliates or his or her legal representatives or heirs any rights as a third-party beneficiary or otherwise or any other rights or remedies of any nature or kind whatsoever under or by reason of the transactions contemplated by this Agreement or by the Related Agreements, including, without limitation, any rights of employment, continued employment or any rights under or with respect to any employee benefit, welfare benefit, pension or other fringe benefit plan, fund, program or arrangement.

9.13    Survival. None of the representations or warranties of Seller or Buyer set forth in this Agreement, any Related Agreement, or in any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing. The covenants and agreements of the parties contemplated to be performed in whole or part after the Closing shall survive the Closing.

9.14    Schedules. Any matter disclosed in any schedule to this Agreement shall be deemed to have been disclosed in each other schedule to this Agreement so long as the matter is disclosed on the applicable schedule in sufficient detail to make it apparent to Buyer that such disclosure is relevant to such other schedule.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

37

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered as of the date first above written.

SELLER:                                          JOSEPH-BETH BOOKSELLERS, LLC

By:
Name: JOHN PATE
Title: SECRETARY

JOSEPH-BETH CAFE, LLC

By:
Name: JOHN PATE
Title: SECRETARY

JB BOOKSELLERS, INC.

By:
Name: JOHN PATE
Title: SECRETARY

BUYER:                                           BOOKSELLERS ENTERPRISES, LLC

By:
Name:
Title:

38

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered as of the date first above written.

SELLER:                                    JOSEPH-BETH BOOKSELLERS, LLC

                                           By:
                                           Name:
                                           Title:

                                           JOSEPH-BETH CAFE, LLC

                                           By:
                                           Name:
                                           Title:

                                           JB BOOKSELLERS, INC.

                                           By:
                                           Name:
                                           Title:

BUYER:                                     BOOKSELLERS ENTERPRISES, LLC

                                           By:
                                           Name: *Robert Langley*
                                           Title: Robert P. Langley
                                                  Manager

38

## GUARANTY

Reference is made to that certain Asset Purchase Agreement (this "Agreement"), dated April 26, 2011, by and between Joseph-Beth Booksellers, LLC, a Tennessee limited liability company, Joseph-Beth Café, LLC, a Tennessee limited liability company, and JB Booksellers, Inc., a Kentucky corporation, and their affiliated debtors and debtors in possession in Bankruptcy Case No. 10-53593 (jointly administered), currently pending in the bankruptcy court for Eastern District of Kentucky (collectively, the "Seller"), and Booksellers Enterprises, LLC, a Kentucky limited liability company (the "Buyer"). Langley Properties Company, a Kentucky corporation, hereby guarantees the payment by Buyer of the Purchase Price when due under the terms and conditions of the Agreement.

**LANGLEY PROPERTIES COMPANY**

By: _____
          Robert P. Langley, Sole Officer

39